**Edward Alan HILL, Petitioner–Appellant,**

v.

**Anthony J. BRIGANO, Warden, Respondent–Appellee.**

No. 98–3714.

United States Court of Appeals, Sixth Circuit.

Argued: Nov. 2, 1999

Decided and Filed: Dec. 22, 1999

---

Jill E. Stone (argued and briefed), David H. Bodiker, Cynthia A. Yost (briefed), Public Defender's Office, Ohio Public Defender Commission, Columbus, Ohio, for Petitioner–Appellant.

Stuart W. Harris (argued and briefed), Office of the Attorney General, Corrections Litigation Section, Columbus, Ohio, for Respondent–Appellee.

Before: KENNEDY and RYAN, Circuit Judges; CLELAND*, District Judge.

---

* The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

## OPINION

KENNEDY, Circuit Judge.

Petitioner, Edward Alan Hill, appeals the denial of his petition for a writ of habeas corpus. Defendant was convicted in the state courts of Ohio on two counts of aggravated murder with firearm specification under Ohio Rev.Code § 2903.01(A)[1] and two counts of aggravated robbery under Ohio Rev.Code § 2911.01. His appeal raises four issues: (1) whether appellant was denied his Fifth and Sixth Amendment rights through the use of unconstitutionally obtained evidence against him at trial; (2) whether the trial court violated the appellant's Sixth Amendment right to a fair trial by limiting defense counsel's voir dire of prospective jurors; (3) whether appellant was denied his Sixth Amendment right to confrontation when the prosecution was allowed to introduce into evidence hearsay statements; and (4) whether appellant was denied his Sixth Amendment right to a fair trial by the cumulative effect of prosecutorial misconduct. Concluding that the State of Ohio's adjudication of issues 1, 2 and 4 involved no unreasonable application of clearly established federal law and that the admission of the hearsay statement in issue 3 was harmless, we AFFIRM.

## I. Facts

On May 8, 1989, Steven Vargo and Charles Sponhaltz were found dead on a rural road in Belmont County, Ohio. During the investigation of this crime, the police uncovered significant evidence linking defendant and his friend, Donald Palmer, to the crime scene. They had been seen in the general vicinity of the crime scene both prior to and after the homicides occurred. Early in the morning on the day of the homicides, defendant, who was driving a brown Dodge Charger, was stopped in the vicinity by the police. A brown Dodge Charger was seen leaving the scene of the crime in a reckless and hurried manner. The police also were contacted by a gas station attendant who had observed the defendant on two occasions on the day of the murder. The defendant's mannerism were so suspicious that two attendants felt the need to copy the defendant's license plate number. Later, the police also discovered physical evidence linking the defendant to the crime scene—finger and shoe prints on Charles Sponhaltz's truck bed were determined to belong to the defendant.

On May 15, 1989, Donald Palmer contacted Columbus police officer Fred Thompson to inquire whether he was a suspect in the homicides. Palmer informed the officer that he and the defendant had been in Belmont County on May 7 and 8 traveling in the defendant's brown Dodge Charger. He also stated that he was missing a .22 caliber pistol, the same caliber as used in the shooting. At the end of the conversation, Palmer gave the officer the defendant's telephone number. The officer contacted the defendant and arranged a meeting. Prior to that meeting, the police located the defendant, Palmer, and the defendant's vehicle and asked the men to accompanying the officers to the police station. The police also obtained defendant's permission to impound his vehicle.

Defendant, after being advised of his rights, did give a statement to police which placed him in the vicinity of the crime; however, when advised he was a suspect, the defendant asserted his Fifth Amendment rights and refused to speak with the officers about the crime. Palmer, who was questioned next, confessed to the crimes and provided the police with information about the defendant's role in these crimes. Defendant, who was advised of Palmer's statement, was questioned briefly but again refused to speak about the crime.

1. The defendant was found guilty of one count of murder in the death of Charles Sponhaltz with firearm specification and one count of aggravated murder of Steven Vargo with two capital specifications.

The next morning, defendant was taken to a hearing in the Franklin County court where he was represented by a public defender. The purpose of that hearing was to clear his transfer to Belmont County, Ohio where the crimes had occurred. On the ride between Franklin County and Belmont County he was encouraged by the transporting officer to tell what had happened but refused to speak. At the defendant's initial appearance, two days after he was arrested, the defendant was appointed counsel by the court. Immediately following this initial appearance and prior to speaking with counsel, defendant and Palmer, for whom counsel also had been appointed, were transported back to the Belmont County jail. During this trip, Palmer asked the police whether they had found certain evidence about which Palmer had told them. The officer responded no, they had not. Defendant then stated that he knew the location of the evidence. Upon arriving at the jail, the defendant agreed to take the officers to this location. The officers videotaped defendant's statements that he was willing to lead police to the location of the evidence and that he understood his rights, including his right to have counsel present. The defendant led the officers to the discovery of the victims' wallets and personal items and spent shell casings.[2]

Prior to the introduction of evidence, defense counsel filed a motion to suppress all the evidence and statements obtained from the defendant after his initial appearance. The court held a suppression hearing at which the officers and the defendant testified. The trial judge found that the defendant had initiated the conversation and validly waived his rights and consented to speak with the police; thus, she permitted the prosecution to introduce this evidence at trial.

The defendant was indicted on six counts in association with the homicides of Sponhaltz and Vargo. Prior to his trial, defendant's accomplice, Donald Palmer, was tried separately, was found guilty and sentenced to death. The press covered Palmer's trial and reported Palmer's testimony. Palmer had testified that he and the defendant had intended to check out George Goolie's home and do some target practice at a range near Goolie's home. On their way to the target range, the defendant drove around a curve and accidentally rear-ended Charles Sponhaltz's vehicle. Sponhaltz exited the vehicle and the defendant and Sponhaltz appeared to be on the verge of a physical altercation. Palmer attempted to intervene and, not thinking about the gun he was holding, hit Sponhaltz. The gun discharged and Sponhaltz fell to the ground. The defendant yelled "Kill him, Kill him" and Palmer shot Sponhaltz two more times. Then Palmer turned and encountered Steven Vargo, a motorist who had come on the scene. Palmer also shot Vargo two times. Palmer stated that the defendant was by the car crying and holding Sponhaltz's legs. The defendant asked Palmer to help him place the body in the bed of Sponhaltz's truck and the defendant drove Sponhaltz's truck away from the scene. Sponhaltz's truck was found parked in a field about a mile from Vargo's body. Palmer also testified that the defendant took the wallets of the victims and hid them so that the victims could not be identified immediately.

Approximately a month before the date set for empaneling the jury, the court granted a defense motion to move the defendant from one jail to another. Because of a miscommunication between the court and the attorneys[3] the prosecutor

2. The facts and circumstances leading up to the defendant's incriminating statements are set forth more fully in the section of this opinion addressing the defendant's first claim of error—whether his Fifth and Sixth Amendment rights were violated by the introduction at trial of illegally obtained evidence.

3. The judge signed the order believing that the transfer was "by agreement of all parties."

was not informed of the motion until after it had been granted and the defendant had been moved. The prosecutor commented to the press about this movement of the defendant from one jail to another.[4] These statements resulted in the publication of an editorial discussing the impropriety of moving the defendant. Upon becoming aware of the prosecution's objection to the move, the court ordered that the defendant be returned to the jail to which he was first assigned.

Prior to the empaneling of the jury, both defense counsel and the prosecution made motions for a change of venue. The trial court judge deferred ruling on these motion until the court made a determination whether an impartial jury could be empaneled. The judge informed both parties that they would need to submit their questions for the voir dire to the judge for approval prior to the beginning of the voir dire. The judge then reviewed the questions and informed both parties of the questions that were permissible to ask. The court instructed counsel that only approved questions could be used in voir dire. Two jurors were struck from the panel for cause by the court because they stated that they would not impose the death penalty. Defense counsel's request to rehabilitate the potential jurors was denied by the court.[5] Defense counsel also objected to the empaneling of any juror who had been exposed to pre-trial publicity.[6] The trial court overruled this objection. Upon completion of the voir dire, the trial judge determined that an unbiased

jury was empaneled and denied both parties' motions for a change of venue.

At trial, the prosecutor presented the testimony of Officer Fred Thompson. Thompson testified to the contents of his telephone conversation with Donald Palmer. The defendant objected to this testimony as inadmissible hearsay. The court overruled this objection on the grounds that it was admissible under the co-conspirator exception to the hearsay rule. The court allowed Thompson to tell the jury about Palmer's question as to whether he was a suspect and his statements about the fact that he and the defendant were in Belmont County on May 7th and 8th in defendant's car, that they had been to a gas station in the vicinity, that they had driven in the area where George Goolie lived (which was near the murder scene), and that Palmer was missing a .22 caliber revolver.

During its case-in-chief, the prosecution also presented the testimony of Cammy Palmer, defendant Hill's sister. The prosecutor, however, requested and was granted permission to treat Ms. Palmer as a hostile witness. Ms. Palmer would not endorse a written statement she had made earlier to the police. She contended that she was on pain medication when the statement was written and she could not remember whether her statement was accurate. By treating Ms. Palmer as a hostile witness, the prosecutor was able to introduce Ms. Palmer's prior statement to get her to admit most of the facts in her

4. On December 20, 1989, The Intelligencer quoted the prosecutor:
   I was shocked to learn that the defense maneuvered behind our backs to have Mr. Hill placed in the Barnesville jail so he can enjoy more frequent family visits and watch T.V. . . . We are immediately filing a motion to have him returned to the county jail where he belongs. We are also considering asking the court to make him pay a portion of his defense costs, since if he is able to come up with $15 per day to stay at a more comfortable jail, he ought to help out the taxpayers a little with the tremendous expense of his defense.

5. Defendant argues that the court improperly limited his questioning of juror Stillion by refusing to allow him to ask any questions during the death penalty portion of the voir dire and limited his questioning of juror Pacifico by prohibiting rebuttal questions about the death penalty.

6. According to the defendant all fifty-seven jurors voir dired had read about the crime and of his accomplice's trial, conviction and sentence.

prior statement and to impeach her. In its closing argument, the prosecution commented on the fact that the defendant had offered very little evidence and stated that the defendant was a liar. Defendant's counsel objected to these comments and the court overruled these objections. Upon completion of the presentation of the evidence, the case was submitted to the jury and the jury returned a verdict of guilty on four counts in the indictment. The court sentenced the defendant to life in prison.

The defendant appealed the verdict to the Belmont County Court of Appeals which denied relief in a written opinion. Defendant requested reconsideration which was denied, as was his request to the Ohio Supreme Court to accept jurisdiction over his case. On July 25, 1996, defendant filed the instant petition for a writ of habeas corpus. The petition was dismissed with prejudice and the district court denied defendant's request for a certificate of appealability. However, this court granted defendant a certificate of appealability. This appeal followed.

## II. Discussion

### A. Standard of Review

Because petitioner filed his petition for a writ of habeas corpus after April 24, 1996 this court applies the standard of review as set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). This provision states as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

■ Because none of the defendant's claims implicate the "contrary to" clause of this provision we will evaluate his claims under the "unreasonable application" prong.[7] In *Nevers v. Killinger*, 169 F.3d 352 (6th Cir.1999), this court announced the standard of deference to afford state court decisions under the "unreasonable application" prong of § 2254(d). This standard requires this court to uphold a state court's determination unless the "unreasonableness of a state court's application of clearly established Supreme Court precedent will not be 'debatable among reasonable jurists,' *Drinkard [v. Johnson]*, 97 F.3d at 769, if it is 'so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes.'" *Nevers*, 169 F.3d at 362.

We turn then to defendant's four claims of error. His first claim is that his Fifth and Sixth Amendment rights were violated by the introduction of evidence obtained after he had asserted his right to counsel. His second claim is that his Sixth Amendment right to a fair trial was violated when the trial court improperly limited his voir dire of potential jurors. His third claim is that his Sixth Amendment right to confront witnesses was violated when the trial court permitted the introduction of hearsay evidence. His final claim is that his Sixth Amendment right to a fair trial was violated by the cumulative effects of prosecutorial misconduct.

---

**7.** Even if issue (3) is analyzed under the "contrary to" standard, the result would be the same.

## B. Edwards Violation

█ Defendant contends that the district court erred in finding that his Fifth and Sixth Amendment rights had not been violated by the trial court's decision to permit the introduction of evidence obtained in violation of the standard set forth in *Edwards*. He argues that his rights were violated by the introduction of three statements: (1) his statement in the police car as he was transported from his initial appearance; (2) his subsequent statement at the jail; and (3) his final statement at the location where the evidence was recovered. He also argues that his rights were violated by the introduction of the wallets and personal items of the victims and the bullets into evidence. These items were located by the police based on the three statements. Because the defendant initiated the conversation that led to the discovery of this evidence the trial court's decision to admit this evidence did not violate the defendant's Fifth and Sixth Amendment rights.

█ In reviewing defendant's habeas claim, this court must first ascertain whether the Supreme Court has announced "clearly established law" which sets forth the standard for assessing a defendant's waiver of his Fifth and Sixth Amendment right to counsel. In *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), the Supreme Court held that once a suspect invokes his Miranda rights, all interrogation must cease unless the defendant initiates further communication. If the police, rather than the suspect, initiate further communication, any waiver of the right to counsel is invalid. The Supreme Court, in *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2834–35, 77 L.Ed.2d 405

(1983), announced the proper standard for assessing whether a suspect had initiated the conversation. If the suspect's inquiry demonstrated a desire to engage in a generalized discussion of the investigation, the suspect had initiated the conversation and the police could obtain a valid waiver of the right to counsel. A suspect's inquiry as to the routine incidents of the custodial relationship, however, could not result in a valid waiver of the right to counsel.

█ Prior to making the incriminating statements and leading the police to the discovery of the contested evidence, the defendant had been in custody for two days. Defendant voluntarily agreed to accompanying Belmont County officers to the Columbus police station for questioning about these homicides on the evening of May 16. During the initial interrogation, the defendant asserted his right to counsel. The officers ceased the interrogation for approximately two hours.[8] During this two hour period, the officers interrogated Palmer who confessed to the crimes. After the officers completed their interrogation of Palmer, he and the defendant were placed together in a room for approximately forty-five minutes. The officers then renewed their interrogation of the defendant. He again asserted his right to counsel and the officers ended the interrogation, though not immediately.

█ The next morning defendant appeared before the Franklin County court for a Rule 4 hearing.[9] At this hearing he was represented by counsel. This attorney testified at the suppression hearing that although he could not remember telling the defendant not to speak to the police about the case without his attorney

---

8. Although the officers did not immediately honor the defendant's request to end the interrogation until his attorney was present, the initial interrogation ended soon after this request. Nevertheless, the officers' conduct violated the defendant's Fifth and Sixth Amendment rights.

9. Because defendant's arrest was made in Franklin County pursuant to a warrant issued in Belmont County, defendant could not be transferred to Belmont County until he had appeared before a Franklin County judge and been given the opportunity to consult with an attorney, or another person of his choice, and to post bail.

present, it was the attorney's normal practice to do so. Defendant then was transported from Franklin County to Belmont County. The officer transporting the defendant asked the defendant whether he wanted to talk to anyone and advised him that his cooperation would be beneficial. Again, the defendant refused to engage in a conversation about the homicides and invoked his right to counsel. Upon arriving at the Belmont County jail, the defendant was booked and then placed in an isolation cell. Defendant contends that Sheriff McCort interrogated him for approximately an hour after he was booked. According to the defendant the sheriff advised him to cooperate and stated that his cooperation would be looked upon favorably by the prosecutor. Defendant contends that he invoked his right to counsel and refused to respond to the sheriff's inquiries. Sheriff McCort denies that this interrogation occurred. The state court found Sheriff McCort's testimony credible and determined that this encounter did not take place. The district court, however, found that the encounter did occur. No testimony was taken by the district court, so this finding was only based on the trial court record. Our review of the record provides us with no basis for finding that the state court erred in its determination that the interrogation did not occur. Although Deputy Gorza testified that the defendant was taken to a room after he was booked and was placed in a cell over an hour later, he stated that Fred (we make the assumption that he was referring to Officer Fred Thompson) took the defendant to the room, not the sheriff. Defense counsel did not question Officer Thompson about the incident, so we believe that the state court's determination that McCort's testimony was more credible than the defendant's testimony was not unreasonable. *See* 28 U.S.C. § 2254(e)(1) ("[A] determi-

nation of a factual issue made by a state court shall be presumed to be correct. The [habeas] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). There is no basis to reject the state court's factual credibility finding.

On the morning of May 18, the defendant was transported to court for his initial appearance. The defendant was not represented by counsel at this hearing, but the court did appoint counsel for the defendant at the end of the hearing. The court also informed the defendant of his *Miranda* rights. Upon completion of the hearing, the defendant and Palmer were transported back to the jail by Officer Giesey and Sheriff McCort. Palmer inquired of the officers whether they had found the evidence about which he had spoken. Sheriff McCort answered in the negative. The defendant then stated that he knew where the evidence was located. No further conversation about this issue took place in the vehicle.

Upon the defendant's arrival at the jail, he asked to speak with Sheriff McCort.[10] He told the sheriff that he could take the officers to the location of the evidence. The sheriff advised the defendant that neither he nor the other officers could initiate a conversation with the defendant and that the defendant was entitled to be represented by his attorney. The defendant stated that he understood and was willing to proceed to the site of the evidence without his attorney. The sheriff requested that another officer videotape the defendant waiving his right to an attorney and acknowledging that he was willing to lead the officers to the site of the evidence. The defendant led the officers to the evidence and the officers discovered the victim's

10. Defendant disputes the trial court's finding that he initiated the conversation with the sheriff at the jail. At the suppression hearing, the defendant testified that Sheriff McCort approached him about his statement in the vehicle. Because we are required to defer to

the state court's determination of facts and the defendant has not presented clear and convincing evidence to demonstrate that the trial court's finding was erroneous we must accept the finding of the trial court on this factual issue. *See* 28 U.S.C. § 2254(e)(1).

wallets and personal items and spent shell casings at this location.

Defendant argues that his Fifth and Sixth Amendment rights were violated because the officers never honored his request for interrogation to cease until his attorney was present. Although the defendant does not deny that he made the statement that he knew where the evidence was located, he contends that this statement does not constitute initiation as defined in *Bradshaw* because initiation only occurs if the police honor the defendant's right to counsel. Defendant argues that the cumulative effect of the numerous *Miranda* violations by Belmont County officers coerced the defendant into providing the officers with information about the location of the evidence. Because he did not voluntarily waive his right to counsel, defendant contends that the state trial court erred in permitting the introduction of his statements and the evidence obtained from these statements at trial.

In support of his argument, defendant relies on the Eleventh Circuit's decision in *United States v. Gomez*, 927 F.2d 1530 (11th Cir.1991). The Eleventh Circuit determined that

> the validity of [a defendant's waiver of his *Miranda* rights] logically depends on the accused being free from further interrogation. In other words, the "initiation" must come prior to the further interrogation; initiation only becomes an issue if the agents follow Edwards and cease interrogation upon a request for counsel. Once the agents have, as here, violated Edwards, no claim that the accused "initiated" more conversation will be heard.

927 F.2d at 1538–39. The Eleventh Circuit, however, did note a possible exception to the rule announced in Gomez. In a footnote, the court stated that "it may be possible for enough time to elapse between the impermissible further interrogation and the 'initiation' that the coercive effect of the interrogation will have subsided." 927 F.2d at 1539 n. 8.

We believe that this case falls into the exception noted by the Eleventh Circuit. The last impermissible interrogation of the defendant occurred in the vehicle as the defendant was transported to the Belmont County jail. This interrogation occurred on the evening of the 17th. Prior to making the incriminating statements, the defendant spent an evening in the Belmont County jail in an isolation cell. On the morning of the 18th, he was transported to the courthouse for his initial appearance before the judge. Although the defendant was not represented by counsel at this hearing, the judge did inform the defendant of his Miranda rights and appointed counsel for the defendant at the end of the hearing. It is unclear from the record whether the defendant knew when he would have the opportunity to speak with his newly appointed counsel, but it is undisputed that the defendant was aware that he had this right. Taking into account both the time lapse between the impermissible interrogation and the incriminating statements by the defendant and the fact that the defendant was aware that he had been assigned counsel, we believe the trial court was correct in analyzing the admissibility of this evidence under the initiation exception to *Edwards*.

Accepting that the correct inquiry to make in assessing the validity of the defendant's waiver of his Fifth and Sixth Amendment rights is whether the defendant initiated the conversation, we must determine whether the state court erred in finding that the defendant initiated the conversation that led to the discovery of the contested evidence. Defendant's initial statement that he knew where the evidence was located and his later statements that he wanted to talk to the officers about the evidence demonstrated a general desire to communicate about the investigation. In *Bradshaw*, the Court noted that the officer told the defendant that he did not have to talk to the officer and only after the defendant stated that he understood did a conversation about the investi-

gation take place. 462 U.S. at 1046, 103 S.Ct. at 2835. In this case, the defendant's statement about the evidence indicated a an interest or desire to discuss the specifics of the criminal investigation. In addition, prior to the discovery of any of the challenged evidence, the defendant stated numerous times that he understood that he had the right to have his lawyer present. Because the state court's determination that the defendant had initiated the conversation and had validly waived his Fifth and Sixth Amendment rights prior to the discovery of the contested evidence is not unreasonable we affirm the district court's decision denying the defendant relief on this ground.

## C.  Limitation on Voir Dire

Defendant's second assignment of error is the district court's determination that the state trial court did not violate the defendant's Sixth Amendment right to a fair trial by limiting the jury voir dire. Defendant argues that the trial judge's decision to restrict the defendant's questioning about pretrial publicity prevented the defendant from obtaining an impartial jury. Defendant also argues that the trial court erred when it denied defense counsel the right to inquire further as to two potential jurors' views on the death penalty. We do not believe that defendant's constitutional right to a fair trial was violated by the trial judge's exercise of discretion in limiting voir dire.

### 1.  Pre-trial Publicity

The defendant contends that he did not receive a fair trial because the trial judge prevented him from uncovering bias in potential jurors through the use of voir dire. In evaluating this claim this court is guided by the traditionally broad discretion afforded the trial judge in conducting voir dire. *See Ham v. South Carolina,* 409 U.S. 524, 528, 93 S.Ct. 848, 851, 35 L.Ed.2d 46 (1973); *see also Mu'Min v. Virginia,* 500 U.S. 415, 424, 111 S.Ct. 1899, 1904, 114 L.Ed.2d 493 (1991) (noting that

"the trial court retains great latitude in deciding what questions should be asked on voir dire"). A trial court's finding of juror impartiality may "be overturned only for 'manifest error'." *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984).

This case is governed by the Supreme Court's decision in *Mu'Min.* In *Mu'Min,* the defendant challenged the trial court's refusal to question prospective jurors about the specific contents of publications about the defendant to which they had been exposed. *See Mu'Min,* 500 U.S. at 417, 111 S.Ct. at 1901. The Supreme Court upheld the trial court's decision finding that the relevant inquiry was whether an impartial jury had been impaneled. Because the trial court discerned from the voir dire whether a potential juror had been exposed to pre-trial publicity and whether that publicity would prevent the juror from being impartial, the Supreme Court held that the limitations on voir dire did not violate the defendant's constitutional rights. *See id.* at 430–32, 111 S.Ct. 1907–08. Although eight of the twelve jurors empaneled in *Mu'Min* were aware of news reports about the defendant, all of the jurors empaneled stated that they had an open mind about the defendant and could be impartial. *See id.* at 417, 111 S.Ct. at 1901. The Supreme Court found that the pre-trial publicity did not rise to the level of the publicity seen in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); thus, a change of venue was not constitutionally mandated. These factors combined with the acknowledgment that trial courts are granted wide discretion in conducting voir dire led the Court to find no constitutional violation.

Applying *Mu'Min* to this case, we must evaluate whether the state court was unreasonable in its determination that an impartial jury had been empaneled. The Sixth Circuit in *Nevers,* addressed the issue of the effect of pre-trial publicity on the empaneling of a fair and impartial jury. In Nevers, the defendant appealed

the trial court's denial of his motion to change venue due to pre-trial publicity. 169 F.3d at 354.[11] The *Nevers* Court determined that the Supreme Court had held that a defendant's Sixth Amendment rights are violated only when the level of pre-trial publicity was such that the trial setting was so corrupted by the press that a fair trial was impossible. *Id.* at 362–64.

The pre-trial publicity in this case did not rise to a level which would make a fair trial impossible. Although all fifty-seven jurors voir dired had knowledge of the crime, the voir dire procedure utilized by the judge allowed counsel to ascertain whether a potential juror was influenced by the publicity. All of the jurors empaneled stated that they would perform their duties impartially and base their verdict on the evidence presented at trial. In the cases where the Supreme Court has found pre-trial publicity to rise to a level which infringes the defendant's right to a fair trial, the pre-trial publicity has been more substantial than in this case or the jurors empaneled stated that they were biased. *See Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (finding carnival atmosphere created by the press infringed defendant's right to a fair trial); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (same); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (determining that the airing of the confession of the defendant prevented the empaneling of an impartial jury); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (finding that eight of the twelve empaneled jurors had already formed the opinion that the defendant was guilty). In light of this precedent, we do not believe that the state court's decision to limit defense counsel's voir dire resulted in a violation of the defendant's Sixth Amendment right to a fair trial.

### 2. Challenges for Cause

■ The defendant also argues that the trial court erred in denying defense counsel the right to rehabilitate two jurors who were dismissed for cause because they stated they could not impose the death penalty. In *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), the Supreme Court held that "the proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" We believe that the trial judge's dismissal of these two jurors conformed with the standard announced in *Wainwright.*

■ When reviewing a trial court's dismissal of potential jurors for cause, this court must determine whether the trial court's decision prevented the empaneling of an impartial jury. It is not enough for the defendant to show that the decision to exclude the two jurors was improper. He also must show that the jury selected was biased. This he cannot do. The Court in *Ross v. Oklahoma,* 487 U.S. 81, 83–85, 108 S.Ct. 2273, 2275–76, 101 L.Ed.2d 80 (1988), addressed the issue of whether the trial court's error in refusing to exclude a potential juror for cause required reversal. The defendant had to exercise a peremptory challenge to exclude this juror after the court refused to remove the juror for cause. *See id.* The defendant argued that had the court properly excluded the juror the resulting jury panel may have been different. *See Ross,* 487 U.S. at 87, 108 S.Ct. at 2277–78. The Supreme Court held that this possibility did not mandate reversal. "[P]eremptory challenges are not of constitutional dimension. They are

---

**11.** Although the defendant in this case does not appeal the trial court's decision not to grant his motion for a change of venue, he does contend that the denial of this motion

combined with his limited voir dire prevented him from determining whether the panel was biased due to pre-trial publicity.

a means to achieve an impartial jury. So long as the jury that sits is impartial, the fact that the defendant has to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id.* at 88, 108 S.Ct. at 2278.

In this case, the defendant has presented no direct evidence demonstrating that the jury selected was biased.[12] Even if we determined that the trial court erred in dismissing the two potential jurors without allowing defense counsel the opportunity to rehabilitate them, we cannot grant relief unless we determine that the defendant's right to a fair trial was violated because he was convicted by a biased jury. Finding that the state court's determination that an impartial jury was empaneled is not unreasonable, we deny defendant's request for relief on this claim.

### D. Inadmissible Hearsay

◼ Defendant's third claim is that Officer Thompson's testimony about his conversation with Donald Palmer was inadmissible hearsay and its admission violated the confrontation clause of the Constitution. The state trial court permitted the introduction of this testimony because the judge found that it fell within the co-conspirator exception to the hearsay rule. The district court agreed that the testimony was admissible. Although we believe that the district court erred in that determination, we find that the introduction of this evidence was harmless error. Because this testimony did not have a substantial and injurious effect on the out-

come of the trial we affirm the judgment of the district court.

The state trial court permitted Officer Thompson to testify about a portion of the conversation he had with Donald Palmer on May 4 about the homicides. Officer Thompson testified that Palmer inquired as to whether he was a suspect in the crime and stated that he and the defendant had been in the area of the crime scene on the day of the homicides in the defendant's vehicle. He also informed the officer that his .22 caliber gun was missing. Defendant objected to this testimony on the grounds that it was inadmissible hearsay. Palmer was not available to testify at the defendant's trial, so the defendant was unable to cross-examine Palmer about these statements. The trial court found that this testimony had sufficient indicia of reliability and was admissible under the exception to the hearsay rule.[13]

◼ The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. Defendant contends that the admission of Officer Thompson's testimony about his conversation with Palmer violated the defendant's confrontation rights because he was not able to cross-examine Palmer. The Supreme Court has announced a two-prong test to determine whether hearsay is admissible under the Confrontation Clause. *See Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980). First, "the prosecution must either produce, or demon-

---

12. The defendant contends that the jury's exposure to pre-trial publicity evidences its bias. Because we reject both defendant's argument that pre-trial publicity was so pervasive as to prevent the empaneling of an impartial jury and his argument that he was not able to uncover juror bias due to the limited voir dire we find that the defendant has produced no evidence to show that the empaneled jury was biased.

13. In overruling the defendant's objection to the introduction of this testimony into evi-

dence, the trial judge also speaks of the fact that the testimony is corroborated by other evidence. In fact, she denies the admission into evidence of a part of the conversation that she believes is uncorroborated. While it appears that the judge views the testimony as admissible under the co-conspirator exception, an argument could be made that the judge admitted the evidence under the catchall hearsay exception. The testimony is not admissible under either exception.

strate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* Then, once the declarant is shown to be unavailable, "his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." 448 U.S. at 65, 100 S.Ct. at 2539. The Supreme Court has determined that the general requirement of unavailability does not apply when the statement being offered is an out-of-court statement of a co-conspirator, *see United States v. Inadi,* 475 U.S. 387, 391, 106 S.Ct. 1121, 1124, 89 L.Ed.2d 390 (1986), and that these statements carry with them sufficient "indicia of reliability" because the co-conspirator exception is firmly rooted, *see Bourjaily v. United States,* 483 U.S. 171, 182, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987). The holding in Bourjaily, however, is limited to those statements that fall within the traditional common law formulation of the hearsay exception. *See id.* at 183, 107 S.Ct. at 2782. The Court also has held that those statements introduced under the residual hearsay exception "almost by definition ... do not share the same tradition of reliability that supports the admissibility of statements under a firmly rooted hearsay exception." *Idaho v. Wright,* 497 U.S. 805, 817, 110 S.Ct. 3139, 3147–48, 111 L.Ed.2d 638 (1990).

In this case, the trial court permitted Officer Thompson's testimony about his conversation with Palmer finding that the testimony fell within the co-conspirator hearsay exception under Ohio law. Because Ohio law differs from the common law formulation of the co-conspirator exception this court must determine whether there were sufficient indicia of reliability to permit the introduction of this evidence. In *State v. Shelton,* 51 Ohio St.2d 68, 72–73, 364 N.E.2d 1152, 1155 (1977), the Ohio Supreme Court announced that a declara-

tion of a co-conspirator is inadmissible unless the declaration was made during the course of and in furtherance of the conspiracy or during the concealment of the criminal conduct. The state trial court found that Palmer's statements to Officer Thompson were made during the concealment phase. This finding, however, appears to be in direct conflict with the Ohio Supreme Court's holding in *State v. Liberatore,* 69 Ohio St.2d 583, 433 N.E.2d 561 (1982). In *Liberatore,* the Court determined that an accomplice's statements to an FBI agent about the crime could not be found to be in furtherance of or during the pendency of the conspiracy or concealment of the crime. 69 Ohio St.2d at 587, 433 N.E.2d at 565. Although there may be an occasion where a suspect's statements to police are in furtherance of a conspiracy to conceal a crime, we do not believe that Palmer's statements fall into this category. The state court found that Palmer's conversation with Officer Thompson was an attempt to elicit information from Thompson about the crime. While we do not disagree with this interpretation, we do not believe that Palmer's statements constitute an attempt to conceal the crime. There was no evidence of the existence of some conspiracy between Palmer and the defendant to conceal this crime by conversing with the police about it. We conclude, therefore, that this hearsay would not be admissible under the common law formulation of the co-conspirator exception, nor did this conversation have sufficient indicia of reliability to satisfy the requirements of the Confrontation Clause. Because this testimony was hearsay and does not fall within a hearsay exception the trial court erred in permitting Officer Thompson to testify to the content of his conversation with Palmer.

■■■■ Finding that the admission of this testimony was erroneous, this court can grant the defendant's writ only if it finds that the error was not harmless. *See Wright,* 497 U.S. at 823–24, 110 S.Ct. at 3150–51. In order for this court to find

that the admission of this evidence was not harmless, we must find that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict." *See Nevers*, 169 F.3d at 371 (holding that the *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993), standard continues to apply on habeas review even after the amendments to the AEDPA). We find that the admission of this evidence was harmless error because it did not have a "substantial or injurious effect" on the outcome of this case. In light of the great weight of evidence against the defendant, we do not believe the introduction of these limited statements by Palmer had any significant influence on the jury's decision-making process. The majority of the information conveyed in these hearsay statements was already before the jury through other admissible forms of evidence. For example, Officer Thompson's testimony that Palmer told him that he and the defendant were in the vicinity of the crime scene on the day of the homicides was testified to by numerous witnesses who saw the defendant in the area and was confirmed by defendant's own not-objected-to statement that he was in the vicinity. Thompson also testified that Palmer stated he was missing a .22 caliber gun. Palmer's possession of this gun was acknowledged by the defendant's sister in her testimony that Palmer had taken her gun when the defendant and Palmer left for Belmont County. Because the admission of this hearsay testimony was harmless error we deny the defendant's request for habeas relief on this ground.

### E. Prosecutorial Misconduct

■ Defendant's final claim is that the district court erred in determining that the cumulative effect of prosecutorial misconduct did not constitute a violation of his constitutional rights. He contends that combined effect of four acts by the prosecutor constitute prosecutorial misconduct and a denial of his right to a fair trial under the Sixth Amendment. The four acts are as follows: (1) the prosecutor's comments to the media prior to the trial; (2) the prosecutor's impeachment of Cammy Palmer; (3) the prosecutor's statements in closing argument implying that the defendant was a liar; and (4) the prosecutor's statements in closing argument commenting on the defendant's failure to testify. Because none of the prosecutor's actions rise to the level of prosecutorial misconduct we affirm the district court's finding that the defendant is not entitled to relief on this claim.

■ For the prosecutor's misconduct to be found to violate defendant's constitutional rights this court must determine that the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). This Circuit in *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (en banc), set forth the factors to be considered when analyzing a claim of prosecutorial misconduct.

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

On habeas, this court reviews a claim of prosecutorial misconduct for harmless error. *See Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.1997).

We find that the prosecutor's conduct does not constitute prosecutorial misconduct. The prosecutor's comments to the press were the result of a miscommunication between the court, the defense counsel, and the prosecutor. In addition, they occurred prior to the empaneling of the jury and the voir dire of the jury included extensive questioning about pre-trial publicity. The prosecutor's impeachment of Cammy Palmer was made necessary by Ms. Palmer's testimony on the stand. We cannot say that the trial court erred either

in finding that the prosecutor was surprised by Ms. Palmer's testimony or in allowing the prosecutor to treat Ms. Palmer as hostile witness. Nothing the prosecutor did in relation to the questioning of Ms. Palmer amounts to prosecutorial misconduct. During closing arguments the prosecutor did comment on the defendant's lying to the police, but that fact was admitted by defense counsel in his closing arguments. The prosecutor also commented on the defendant's failure to present evidence supporting his theory of this case. We do not think it was unreasonable for the state court to find that the prosecutor was commenting on the evidence, rather than the defendant's failure to testify. Because the prosecutor's actions do not constitute prosecutorial misconduct we find that the defendant is not entitled to relief on this ground.

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court and deny petitioner's request for a writ of habeas corpus.