*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0227p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

—————————————

DAVID DENNARD MCKINNEY,

        *Petitioner-Appellant,*

    *v.*

NICK LUDWICK,

        *Respondent-Appellee.*

No. 10-1669

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 08-14834—John Corbett O'Meara, District Judge.

Argued: July 22, 2011

Decided and Filed: August 19, 2011

Before: KENNEDY, SILER, and McKEAGUE, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:** Raymond G. Mullins, Ypsilanti, Michigan, for Appellant. Jon P. Wojtala, WAYNE COUNTY PROSECUTOR'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Raymond G. Mullins, Ypsilanti, Michigan, for Appellant. Jon P. Wojtala, WAYNE COUNTY PROSECUTOR'S OFFICE, Detroit, Michigan, for Appellee.

—————————————

## OPINION

—————————————

    CORNELIA G. KENNEDY, Circuit Judge. Petitioner David Dennard McKinney is a Michigan prisoner sentenced to life imprisonment on a felony-murder conviction stemming from his participation in the robbery and arson of a gun shop. He now petitions for a writ of habeas corpus on the grounds that the admission at trial of incriminating statements he gave to police violates the rights established by the Supreme

Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477 (1981). We **AFFIRM** the district court's denial of habeas relief.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

On August 3, 2004, emergency personnel responded to a fire at Alexander's Gun Shop in Inkster, Michigan. Several hours passed before firefighters were able to suppress the fire, which caused large quantities of ammunition kept in the store to explode and the roof to collapse. Once the police were able to access what remained of the building, they discovered the body of Clyde Alexander, one of the store's owners, with tie-cuffs attached to one of his wrists. An autopsy confirmed that he had died from smoke inhalation and extensive burns, but it also indicated that he had been beaten before his death and was possibly unconscious when the fire started. Additionally, investigators determined that approximately ninety guns were missing from the store and accelerants had been used to set the fire. The Inkster Police Department and the U.S. Department of Justice, Bureau of Alcohol, Tobacco, and Firearms ("ATF")[2] began a joint investigation into the death of Alexander and the suspected robbery and arson of the gun shop.

Law enforcement officers received information implicating McKinney in the fire as early as August 17, 2004, at which time he submitted to a polygraph examination when briefly in police custody on other charges. At this time, McKinney retained counsel. On November 20, 2004, McKinney was again arrested on unrelated charges, and Detective Anthony Delgreco used the opportunity to interrogate McKinney about his possible involvement in the Alexander's case. Delgreco read McKinney his rights under *Miranda*, obtained his written waiver of those rights, and confronted him with the evidence against him. Though McKinney initially denied any participation in or knowledge of the crimes, he eventually said "I planned it." Immediately thereafter,

---

[1]The facts recounted here were either undisputed in the state court proceedings or found to be true by the Wayne County Circuit Court.

[2]ATF became involved in the investigation because Alexander's had been a federally licensed arms dealer.

McKinney asked for his lawyer and Delgreco stopped the interrogation. While escorting McKinney back to his cell, Delgreco informed him that the Alexander's case might be prosecuted by the federal government and, in that event, McKinney could face the death penalty for his role in the crimes.

Around 7:15AM the following morning, November 21, 2004, Delgreco entered McKinney's cellblock to perform a routine head count of the prisoners. McKinney called out to Delgreco and said, according to Delgreco, that "he wanted to talk to me and the ATF agent to see what the Feds had against him and how the case was going to proceed." Delgreco reminded McKinney that they could not speak due to McKinney's prior request for his attorney, but McKinney persisted and agreed to talk without his lawyer. In the presence of Delgreco and ATF Agent Ray Tomaszewski, McKinney signed a letter stating "I, David Dennard McKinney, saw Detective Delgreco in the cell block and asked Detective Delgreco if I could hear what the ATF agent had to say about the case. Detective Delgreco contacted the ATF agent and then read me my Miranda rights." Delgreco also re-read McKinney the *Miranda* warnings and McKinney signed another waiver. McKinney then gave a written statement and affidavit admitting that he had both planned the robbery and served as a lookout during it. However, he insisted that starting the fire and killing Alexander had not been part of his plan and, in fact, he had not learned of these events until he later saw them on the news.

On August 24, 2005, a jury in Wayne County Circuit Court found McKinney guilty of felony murder, Mich. Comp. Laws § 750.316(1)(b), and accessory after the fact to arson, *id.* § 750.505, for his role in the robbery, fire, and homicide at Alexander's Gun Shop. The only evidence presented at trial to link McKinney to those crimes was his written confessions of November 21, 2004. On September 7, 2005, the circuit court sentenced him to a mandatory term of life imprisonment for the felony murder conviction and a concurrent term of two-to-five years on the accessory conviction.

Before trial, the circuit court had denied McKinney's motion to suppress his November 21, 2004 statements as products of an unlawful interrogation. McKinney renewed this objection in a post-judgment motion for a new trial, and the circuit court

declined to overturn its previous ruling. On McKinney's direct appeal of his conviction and sentence, the Michigan Court of Appeals concluded that the circuit court had not erred by allowing McKinney's statements into evidence. *People v. McKinney*, No. 269823, 2007 WL 2807961 (Mich. Ct. App. Sept. 27, 2007). The Michigan Supreme Court denied McKinney leave to appeal. *People v. McKinney*, 750 N.W.2d 590 (Mich. 2008).

On November 18, 2008, McKinney filed a habeas corpus petition in the United States District Court for the Eastern District of Michigan under 28 U.S.C. § 2254, again arguing that admission of his November 21, 2004 statements at trial violated his constitutional rights. The district court denied his petition, holding that the state court had not unreasonably applied clearly established federal law in determining that McKinney's Fifth Amendment rights had not been violated. *McKinney v. Ludwick*, No. 08-14834, 2010 WL 1753106 (E.D. Mich. Apr. 29, 2010). The district court issued a certificate of appealability, and McKinney timely appealed.

## STANDARD OF REVIEW

In a habeas case, this court reviews the district court's legal conclusions *de novo* and its factual determinations for clear error. *Lovell v. Duffey*, 629 F.3d 587, 593-94 (6th Cir. 2011), *petition for cert. filed*, No. 10-10543 (May 16, 2011). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). AEDPA thus imposes a "'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citation omitted) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

A state-court decision is "contrary to . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts," *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state-court decision is "an unreasonable application of[] clearly established Federal law," 28 U.S.C. § 2254(d)(1), if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *Williams*, 529 U.S. at 407-08. That is, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly," *id.* at 411; rather, that application must be "objectively unreasonable," *id.* at 409. "'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). "However, the court may look to lower courts of appeals' decisions to the extent they illuminate the analysis of Supreme Court holdings in determining whether a legal principle had been clearly established by the Supreme Court." *Goodwin v. Johnson*, 632 F.3d 301, 308 (6th Cir. 2011).

The habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct. 28 U.S.C. § 2254(e)(1). Under § 2254(d)(2), "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

**ANALYSIS**

On appeal, McKinney challenges the district court's ruling that he is not entitled to habeas relief based on his claim that the Michigan courts unreasonably applied clearly established federal law in admitting his November 21, 2004 statements at trial. In essence, he argues that the government's use of these statements violates the procedural protections designed by the Supreme Court to safeguard his Fifth and Fourteenth Amendment right against self-incrimination from the "inherently compelling pressures" of custodial interrogation. *See Miranda*, 384 U.S. at 467. Specifically, he claims that, after he invoked his right to counsel during the November 20, 2004 custodial interview, Delgreco impermissibly continued to interrogate him by commenting that he might face the death penalty for his involvement in the fire at Alexander's. He argues that, under the Supreme Court's decision in *Edwards*, this interrogation renders invalid his apparent waiver of his right to counsel the following morning, and therefore his confessions were inadmissible at trial.

In its watershed decision in *Miranda*, the Supreme Court held that, prior to questioning, police must warn an individual "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444. After being informed of these rights, the individual may nevertheless choose to speak with police. In that case, any of his subsequent statements may be used as evidence against him, provided the government can demonstrate that he "waived his privilege against self-incrimination and his right to retained or appointed counsel . . . [under the] high standards of proof [set] for the waiver of constitutional rights." *Id.* at 475 (citing *Johnson v. Zerbst*, 304 U.S. 458 (1938)). This requires proof that the individual relinquished his rights voluntarily—as a "product of a free and deliberate choice rather than intimidation, coercion, or deception"—and knowingly—"with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

However, if an individual wishes to assert either the right to remain silent or the right to the presence of counsel, *Miranda* requires the police to scrupulously honor this decision.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74.  And, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474.  The "interrogation" precluded by an individual's invocation of his rights under *Miranda* includes not only express questioning by police, but also "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnote omitted).

In *Edwards*, the Supreme Court strengthened the protection available to an individual who invokes his right to have counsel present during a custodial interrogation by holding that "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." 451 U.S. at 484.  Instead, "an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85; *see also Minnick v. Mississippi*, 498 U.S. 146, 150-53 (1990).  In other words, after an individual asks for counsel during interrogation, the government cannot demonstrate a valid waiver of this right absent the "necessary fact that the accused, not the police, reopened the dialogue with the authorities," *Edwards*, 451 U.S. at 486 n.9, by "evinc[ing] a willingness and a desire for a generalized discussion about the investigation," *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983) (plurality opinion); *accord id.* at 1055 (Marshall, J., dissenting) ("[I]n order to constitute 'initiation' under *Edwards*, an accused's inquiry must demonstrate a desire to discuss the subject matter of the criminal investigation.").

In this case, the parties do not dispute that McKinney invoked his right to counsel in a custodial interrogation during his November 20, 2004 interview with Delgreco. At issue is whether Delgreco's subsequent remark to McKinney that he could possibly face the death penalty constituted an interrogation in violation of *Edwards* and, if so, whether that interrogation renders invalid McKinney's confessions on November 21, 2004. The Michigan Court of Appeals—whose opinion we look to as the last reasoned state-court determination of McKinney's Fifth Amendment claim, *see Davie v. Mitchell*, 547 F.3d 297, 315 (6th Cir. 2008)—determined, over the dissent of one judge, that Delgreco's statement did amount to an impermissible interrogation. Nevertheless, all three judges agreed that the coercive effect of this interrogation had subsided by the time McKinney asked to speak with Delgreco the next morning. Therefore, they reasoned, the initiation exception articulated in *Edwards* applied and McKinney had validly waived his right to counsel before giving his statements. This decision did not reflect an unreasonable application of relevant Supreme Court precedent.

Nothwithstanding the Michigan court's decision, it is by no means clear that Delgreco's death-penalty comment to McKinney qualified as the functional equivalent of interrogation, as opposed to a type of "subtle compulsion" to cooperate that is not foreclosed by *Miranda* and *Edwards*. *See Innis*, 446 U.S. at 303. As the Seventh Circuit has held, a law enforcement officer's "statement regarding the evidence and the possible consequences of the charges [a suspect] faced," including a statement that the suspect may face the death penalty, does not necessarily "r[i]se to the level of interrogation under existing United States Supreme Court precedent." *Easley v. Frey*, 433 F.3d 969, 974 (7th Cir. 2006); *cf. United States v. Payne*, 954 F.2d 199, 203 (4th Cir. 1992) ("[S]tatements by law enforcement officials to a suspect regarding the nature of the evidence against the suspect [do not] constitute interrogation as a matter of law."). Nevertheless, the determination that Delgreco's remark qualified as interrogation is not unreasonable and we will therefore defer to it under AEDPA.

Even if Delgreco impermissibly interrogated McKinney on the night of November 20, 2004, the Michigan court reasonably held that the initiation exception to

*Edwards* covered McKinney's request to discuss his case with Delgreco and Tomaszewski on the morning of November 21, 2004. There is no question that, on that morning, McKinney waved Delgreco down and asked to talk about how his case was going to proceed, signaling "a willingness and a desire for a generalized discussion about the investigation." *See Bradshaw*, 462 U.S. at 1045-46 (1983) (plurality opinion); *United States v. Williams*, 612 F.3d 417, 421-22 (6th Cir.) (holding that suspect, not police, initiated conversation under *Edwards* "by asking to talk about the case"), *cert. denied*, 131 S. Ct. 614 (2010). Delgreco at first refused, citing McKinney's invocation of his right to counsel the previous night, but McKinney would not be deterred. *See Bradshaw*, 462 U.S. at 1046 (plurality opinion) (noting that fact officer told defendant he did not have to talk about his case supported decision that defendant initiated communication with police under *Edwards*). McKinney then signed a written statement indicating that he had asked Delgreco to discuss his case.

Nevertheless, McKinney contends that his request to talk to police was precipitated by Delgreco's death-penalty comment, which we construe as an improper interrogation, and *Edwards* dictates that we therefore must presume that his subsequent confession was involuntary. The Michigan court was not unreasonable to reject this argument. As the Supreme Court has recently explained, "[t]he *Edwards* presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of prolonged police custody by repeatedly attempting to question a suspect who previously requested counsel until the suspect is badgered into submission." *Maryland v. Shatzer*, 130 S. Ct. 1213, 1220 (2010) (citations and internal quotation marks omitted). Recognizing this justification for *Edwards*, this Court in *Hill v. Brigano*, 199 F.3d 833 (6th Cir. 1999), held that, even when police impermissibly interrogate an individual after he invokes his right to counsel, that individual can still initiate communication with police and waive his previously asserted right when "'enough time . . . elapse[s] between the impermissible further interrogation and the "initiation" [such] that the coercive effect of the interrogation . . . subside[s],'" *id.* at 842 (quoting *United States v. Gomez*, 927 F.2d 1530, 1539 n.8 (11th Cir. 1991)). In *Hill*, state police repeatedly questioned the petitioner in violation of *Edwards*, but he did not

give any incriminating statements until the day after the last improper interrogation; further, in the interim the petitioner appeared before a magistrate judge, who informed him of his *Miranda* rights and appointed him counsel. This Court decided that, "[t]aking into account both the time lapse between the impermissible interrogation and the incriminating statements by the defendant and the fact that the defendant was aware that he had been assigned counsel," the trial court had correctly applied the initiation exception to *Edwards*. *Id.*

The facts of this case are markedly similar to those of *Hill*. An entire night passed between Delgreco's death-penalty comment and McKinney's request to talk about his case. Additionally, at the time of his November 20, 2004 arrest, McKinney had already retained an attorney to represent him in this matter; that attorney had acted on his behalf during his August 2004 arrest and interrogation. McKinney attempts to distinguish his case by arguing that Delgreco's remark about the death penalty was more coercive than the improper interrogation to which the defendant in *Hill* was subject. Thus, he asserts, it is unreasonable to conclude that McKinney no longer felt pressured to talk the next morning. However, it is a close question whether Delgreco's remark that McKinney might be prosecuted federally, and might therefore be subject to the death penalty, even amounts to interrogation. This uncertainty is reflected in the fact that, even if McKinney felt some urge to confess after Delgreco's comment, it was not so strong as to induce him to do so immediately, therefore "reducing the likelihood that [McKinney] was under any compulsion to confess." *Holman v. Kemna*, 212 F.3d 413, 419 (8th Cir. 2000) (relying in part on *Hill* to conclude that *Edwards* did not invalidate confession given day after police officer contacted suspect in police custody and told him that his girlfriend had given confession implicating him in crime). It is difficult to understand how Delgreco's statement could be perceived as more likely to induce McKinney to confess than the direct questioning endured by the defendant in *Hill*. This seems especially true in light of precedent establishing that police can inform a suspect about the potential legal consequences of his crime, *Simpson v. Jackson*, 615 F.3d 421, 436 (6th Cir. 2010)—or even promise that, by cooperating, a suspect can avoid the death penalty, *Anderson v. Terhune*, 467 F.3d 1208, 1213 (9th Cir. 2006), or federal

prosecution, *United States v. Redditt*, 87 F. App'x 440, 444 (6th Cir. 2003)—without engaging in behavior that is so inherently coercive as to render a suspect's subsequent confession involuntary.[3]

Accordingly, the Michigan court reasonably relied on *Hill* to conclude that any coercive effect of Delgreco's death-penalty comment had subsided by the time McKinney asked to discuss his case, and *Edwards* did not invalidate his November 21, 2004 statements. For the reasons discussed by the district court, the record also supports the conclusion that McKinney knowingly and voluntarily waived his *Miranda* rights after asking to talk to Delgreco and Tomaszewski on November 21, 2004, *McKinney*, 2010 WL 1753106, at *7-8, and McKinney does not challenge this determination on appeal. Therefore, the admission of McKinney's confessions at trial was not contrary to, or the result of an unreasonable application of, clearly established federal law, and he is not entitled to habeas relief.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the district court's denial of McKinney's petition for a writ of habeas corpus.

---

[3]McKinney points to two other facts that he claims support his position that Delgreco's remark was unduly coercive: (1) that McKinney's attorney had requested the Inkster Police Department to keep him informed of developments in McKinney's case, and Delgreco failed to contact him with news of McKinney's November 20, 2004 arrest; and (2) that Delgreco called Tomaszewski the night of November 20, 2004 and asked him to come to the police station the next morning because McKinney was in custody, presumably so they could interrogate McKinney. First, these facts were not found to be true or, in the case of the second claim, were explicitly rejected in the Michigan courts, and these factual determinations are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1). Second, it is unclear how, even if these facts were true, they would effect the degree to which McKinney felt compelled to confess as a result of Delgreco's death-penalty comment, as McKinney was unaware of either occurrence. *Cf. Moran*, 475 U.S. at 422 ("Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.").