FILED
COURT OF APPEALS
DIVISION II

2014 OCT 21 AM 9: 13

STATE OF WASHINGTON
BY_____
          DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42999-3-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| WILLIAM CHARLES WOMACK, | |
| Appellant. | |

BJORGEN, A.C.J. — William Womack appeals a jury verdict finding him guilty of one count of first degree child rape, four counts of second degree child rape, one count of child molestation, and one count of witness tampering for molesting his daughter over a span of five years and attempting to prevent his ex-girlfriend from testifying about the abuse. Womack appeals, claiming that the trial court erred by (1) granting a continuance for improper reasons, resulting in an untimely trial; (2) admitting statements obtained through custodial interrogation in violation of his right to counsel; and (3) allowing him to represent himself after an equivocal waiver of his right to counsel. Womack also raises a number of other claims in his pro se statement of additional grounds. We affirm.

## FACTS

Womack lived with his girl friend Tamilynn Ashley, AW,[1] his daughter from a prior marriage, and Ashley's two sons. He began sexually abusing AW when she was 8 years old, and the abuse continued regularly until she was 13. When AW tried to struggle free during this abuse, Womack would hold her down tightly so that she would be bruised. Eventually, she stopped trying to escape.

AW eventually told her cousin, KV,[2] that someone in her family was sexually molesting her, but she did not specify the abuser. Later, KV saw Womack tickling AW and yelled at him to get off his daughter. Womack reacted by asking AW if she had told KV and angrily assumed that KV knew of the abuse. AW later told KV that Womack had molested her.

When she was 13, AW told Ashley "that [Womack] . . . raped [her]" in an attempt to get someone to stop the abuse. Verbatim Report of Proceedings (VRP) (Nov. 17, 2011) at 478-79. Ashley confronted Womack about the allegation, who responded by saying, "It will stop. It won't happen again." VRP (Nov. 18, 2011) at 660. After Ashley's confrontation with Womack, his abuse of AW stopped for a few weeks.

The night the abuse resumed, Womack had ordered AW to come into bed with him and Ashley. Womack ordered Ashley and AW to perform sex acts on him and then ordered them to have sex using Ashley's sex toy with his assistance. Then Womack raped AW twice. After that night, the abuse stopped.

---

[1] We use initials to protect the privacy interests of minor sex crime victims.

[2] We use initials to identify AW's cousin in order to maintain confidentiality.

Ashley's relationship with Womack eventually ended. When she moved out, Ashley discovered that someone had removed the toy used to molest AW from the box she had packed it in. Ashley confronted Womack about the missing toy, and he replied that he had taken it, "smirk[ingly]" telling her that "'[he] might need it someday.'" VRP (Nov. 18, 2011) at 673. Womack later explained his reason for "need[ing]" the toy to AW, telling her that "if anything ever did come out in the open, he could threaten [Ashley] with" disclosing her involvement in the abuse by giving police the toy. VRP (Nov. 17, 2011) at 489; VRP (Nov. 18, 2011) at 673.

After Ashley and Womack broke up, AW moved in with her grandparents. Womack, meanwhile, got married and became a long-haul truck driver frequently working out-of-state.

On October 13, 2010 the State filed an information charging Womack with first degree child rape, first degree child molestation, and two counts of second degree child rape. In December 2010, after Womack was arrested in Illinois, Kelso Police Department Detective David Voelker flew to Illinois to return Womack to Washington.

Voelker first met Womack at the Gundy County Jail in Illinois. Before interviewing Womack, Voelker read him his *Miranda*[3] rights. Womack replied that he understood his rights and was nevertheless willing to speak with Voelker. Womack then told Voelker that he knew what the charges against him were, that AW was ungrateful to him considering the effort and money he spent getting custody of her, and that everyone was lying about him when they told Voelker he had abused AW. Womack became upset by Voelker's questioning and ended the interview by stating "[t]alk to my attorney[,] I'm done." VRP (Nov. 14, 2011) at 175.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Voelker returned the next day with another officer to take custody of Womack and transport him to Washington. Voelker again began the interview by reading Womack his *Miranda* rights; Womack again stated that he understood his rights, but would willingly speak with the officers. The officers explained the process for getting Womack to Washington before Voelker began questioning Womack. Womack answered Voelker's first question and then told the officers, "You guys need to talk to my lawyer at this point." VRP (Nov. 14, 2011) at 178. During transit, Womack made several unprompted statements to the officers. At the airport, again without any prompting from the officers, Womack stated that his family was "dead to" him. VRP (Nov. 14, 2011) at 182-84.

Approximately 10 hours after the end of the second interview in Illinois, when the two men arrived at the Cowlitz County Jail in Washington, Womack mentioned a local sheriff's deputy who had been fired for misconduct and told Voelker that his prosecution would make the county look worse than it had as a result of the deputy's conduct.

Volker eventually took Womack into a small room in the jail to discuss the storage of property they seized from him. At the end of this conversation, Voelker told Womack that he was leaving and asked if Womack wanted to tell him anything. Womack told Voelker that he knew all the local judges and that he should not be prosecuted in Cowlitz County. When Voelker asked if he knew something about the local judges, Womack indicated that he was "protecting people" and that although he was "not lying [to Voelker], . . . [he] kn[e]w . . . a lot more" than he was willing to say. VRP (Nov. 14, 2011) at 188-89. During this interaction, Womack also stated that his parents manipulated AW into making the allegations, that AW was a suicide risk, and that he did not think he could ever forgive her.

While awaiting trial, Womack purchased a birthday card for Ashley from the jail commissary. The card contained a note telling Ashley that "'if [she] want[ed] [mention of her involvement in AW's abuse] to stay out of the news media'" she would change her story. VRP (Nov. 18, 2011) at 691. Womack suggested that Ashley testify that AW made wild accusations "to make it seem improbable that he had ever done anything to [AW]." VRP (Nov. 18, 2011) at 691; Ex. 59. Among these, Womack suggested that Ashley testify that AW had claimed that her grandparents, an officer of the Kelso Police Department, Mickey Mouse, and Elvis had all molested her. Ex. 59. Womack hinted that if Ashley did not change her story, he would reveal incriminating evidence about her.

On August 18, 2011, Womack appeared in court and immediately moved to discharge his appointed attorney. Womack emphasized that he wanted a trial as soon as possible and he viewed discharging his attorney as a means to make that happen. The trial court then engaged in a lengthy colloquy with Womack concerning the nature of the charges against him; the maximum sentence he could receive; and the disadvantages of representing himself, including the fact that the court would hold him to the standards it would apply to an attorney, his unfamiliarity with the rules of evidence and procedure, and the awkwardness that would ensue when he took the stand to offer his version of events.

When the trial court asked Womack if he still wanted to represent himself, Womack asked if he could have a different appointed counsel. The trial court initially deferred Womack's question, but the State expressed concern that Womack's request made his waiver of his right to counsel equivocal. The trial court, therefore, returned to Womack's request and asked Womack if he would continue to trial with representation if he received different appointed counsel. Womack initially appeared receptive to this idea, but ultimately rejected it. The trial court

finally asked him, "Okay. And [explain] why you wouldn't want to have a licensed attorney help you [with the trial], recognizing that's a significant penalty, if convicted?" VRP (Aug. 18, 2011) at 45. Womack replied, "I guess my best answer was the only person I really trust at this point is myself." VRP (Aug. 18, 2011) at 45. The trial court concluded that Womack knowingly, voluntarily, and intelligently waived his right to counsel and allowed him to proceed pro se, although the trial court appointed his counsel as standby counsel.

The trial court and the parties then turned to the mechanics of getting the matter to trial. Womack stated that he had not seen discovery in months and expressed concern about preparing for trial, which was set to begin in four days. The State moved to continue trial for three reasons. First, the State expressed concerns about its ability to redact the discovery given to Womack, as required by court rule, in time for a trial on August 22. The State asked for a protective order related to the discovery, which the trial court agreed to hear at a later date. Second, because Womack's counsel had told the State he would move for a continuance, the State allowed witnesses to schedule vacations during the dates set for trial. Finally, the State expressed concern about Womack's ability to prepare for trial and claimed that his decision to proceed pro se might constitute substitution of counsel, which would extend Womack's time for trial deadline. Womack objected, noting that his case had been continued numerous times and stating that he wanted trial to take place on August 22. The trial court found good cause to continue the trial to allow the State to redact the discovery and to allow Womack to prepare his defense.

At the end of the August 18, 2011 hearing, Womack asked how to file a motion to dismiss for violation of the time for trial rule. The court informed Womack that he needed to make the motion in writing and note the matter for a hearing. The court then informed Womack

that his time for trial had not yet expired and that the continuance it had just granted would extend the expiration date again.

Prior to trial, the trial court held a CrR 3.5 hearing to determine the admissibility of the statements Womack made to Voelker. The trial court entered no written findings of fact or conclusions of law after the hearing as required by CrR 3.5(c). However, the court offered a lengthy oral ruling from the bench explaining why it determined all of Womack's statements were admissible. The trial court concluded that Womack had validly waived his rights to silence and counsel at the beginning of his first meeting with Voelker at the Gundy County Jail and concluded that all statements he made between the beginning and end of that first meeting were admissible. The trial court also determined that Womack had invoked his right to counsel when he stated, "[t]alk to my attorney[,] I'm done[,]" at the end of this first meeting. VRP (Nov. 14, 2011) at 228-29.[4] However, the trial court concluded that any statements Womack had made to Voelker after this invocation of his right to counsel were admissible because Voelker had reread Womack his *Miranda* rights prior to the second interview at the Gundy County Jail and Womack had responded by agreeing to talk to Voelker. The trial court also concluded that Womack's unprompted statements in transit to the airport, at the airport, and at the Cowlitz County Jail were admissible as they were not products of custodial interrogation. Finally, the trial court concluded that, although Voelker had engaged in custodial interrogation by asking, as he left the jail, if Womack had anything to tell him, Womack's earlier waiver of his rights to counsel and silence had rendered the resulting statements admissible.

---

[4] The trial court assumed, without deciding, that the statement was an unequivocal invocation of the right to counsel and treated it as such.

7

At trial, AW testified that Womack abused her. Ashley testified that Womack told her that he would stop abusing AW when Ashley confronted him about it; she also testified that she and Womack sexually abused AW on one occasion.[5] Ashley also recounted receiving the birthday card with the note telling her to falsify her story under threat of Womack giving the sex toy to police. KV and her mother took the stand and described how AW told them of the abuse and their observations of Womack as a controlling and overprotective parent with AW. KV testified specifically about the incident where she yelled at Womack to get off of AW and his reaction to her demand.

Womack took the stand in his own defense. He denied ever sexually abusing AW and explained that she had made up everything because she resented his strict policy against her dating boys at a young age. Womack also stated that, although he had never sexually abused AW, he had caught Ashley having sex with her. When asked about the threatening note to Ashley, Womack explained that he had sent the letter as a "ruse" to "shake [Ashley] up and get the truth out." VRP (Nov. 22, 2011) at 1180.

The jury convicted Womack on all counts and found the offenses were crimes of domestic violence because Womack, AW, and Ashley all shared a household. The jury also found that two factors aggravated the child rape and child molestation offenses. First, the jury found that AW was a particularly vulnerable victim. Second, the jury found that the offenses consisted of a pattern of sexual abuse against a victim younger than 18. Given the convictions

---

[5] Ashley also discussed losing her job after the disclosure of her involvement in AW's abuse and her decision to plead guilty to criminal charges requiring her to serve jail time and register as a sex offender.

and aggravating factors, the trial court imposed an exceptional sentence of 819 months to life incarceration.

Womack timely appealed.

## ANALYSIS

### I. TIME FOR TRIAL RULE

Womack first argues that the trial court improperly granted the continuance on August 18, 2011, resulting in an untimely trial in violation of CrR 3.3. Womack contends that the continuance resulted from the State's inability to proceed to trial "even though the case had been pending for almost eight months," and claims this did not constitute a permissible reason for a continuance. Br. of Appellant at 24. The State responds that the trial court properly granted the continuance because Womack's decision to represent himself required the State to redact discovery that would now be provided directly to him and because Womack told the trial court he needed more time to prepare for trial. We agree with the State and find no abuse of the trial court's discretion in granting the continuance.

CrR 3.3 provides criminal defendants with a nonconstitutional right to a timely trial. Where the defendant is continuously incarcerated prior to trial, he or she must receive a trial within "the longer of . . . 60 days after the commencement date specified in this rule, or . . . the time specified under subsection (b)(5)." CrR 3.3(b)(1)(i)(ii). CrR 3.3(b)(5) concerns time excluded from the time for trial calculation, such as the period of continuances granted by the trial court. CrR 3.3(b)(5), (f); *see also* CrR 3.3(e)(3), (f). Where the trial court has excluded time, the time for trial does not "expire earlier than 30 days after the end of that excluded period." CrR 3.3(b)(5).

To exclude a period of time with a continuance, the trial court must determine that the continuance "is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." CrR 3.3(f)(2). We review a trial court's decision to grant a continuance for an abuse of discretion. *State v. Ollivier*, 178 Wn.2d 813, 822-23, 312 P.3d 1 (2013), *cert. denied*, 2014 WL 1906694 (Oct 2014) (No. 13-10090). We hold that the trial court granted a continuance consistent with the requirements of CrR 3.3(f)(2).

First, the August 18, 2011 continuance was necessary for the administration of justice. As noted, Womack unexpectedly moved to represent himself at the August 18, 2011 hearing. His decision to do so required the State to provide discovery directly to him within the four days remaining before trial, two of which were weekend days. CrR 4.7(h)(3) governs the provision of discovery to a criminal defendant, and it allows the State to require appropriate redactions before any court documents are provided to a defendant. The State expressed its need to redact private information from the discovery, and it later explained that it wanted a protective order to guarantee that Womack would not inappropriately disclose information that he learned through the discovery. The continuance allowed the State to perform the unexpected redactions and seek the protective order.

Second, the August 18, 2011 continuance did not prejudice Womack in the presentation of his defense. Womack told the trial court that he was not prepared to represent himself without doing additional research. Further, Womack had complained that he "ha[dn]'t seen the most current discovery for months" and that the short time remaining before trial would make it difficult for him to process the discovery. VRP (Aug. 18, 2011) at 47. Given these representations by Womack, the decision to grant the continuance aided his defense by giving him time to prepare for trial and review the discovery to be provided by the State.

Because the trial court's justifications satisfy the requirements for a continuance found in CrR 3.3(f)(2), its decision was not arbitrary, unreasonable, unsupported by the record, or in violation of the controlling legal standard. *State v. Lindsay*, 177 Wn. App. 233, 248-49, 311 P.3d 61 (2013) (criteria for abuse of discretion), *review denied*, 180 Wn.2d 1022 (2014). Womack's right to a timely trial under CrR 3.3 was not violated.

## II. *Miranda*

Womack also alleges that the trial court erred by admitting statements obtained through custodial interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).[6] Specifically, Womack appears to argue that the trial court erred by admitting 10 statements that he claims police took in violation of his *Miranda* rights. The State contends that many of the statements came before his invocation of his right to counsel and that his invocation of the right to counsel was equivocal, rendering the subsequent statements admissible. We hold that the trial court erred by concluding that statements Womack made between the end of the first interview and his arrival at the Cowlitz County Jail were admissible because the police obtained these statements in violation of Womack's right to counsel. However, because the jury heard only one of these statements, and because that statement was cumulative of other, properly admitted statements, we hold that the error was harmless beyond a reasonable doubt.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V. To protect the "prohibition on compelled self-incrimination" found in the Fifth and Fourteenth

---

[6] Womack makes an identical contention as ground 13 in his statement of additional grounds. We address all of Womack's *Miranda* claims together.

Amendments, the United States Supreme Court requires "that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 481-82, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) (citing *Miranda*, 384 U.S. at 479); *State v. Robtoy*, 98 Wn.2d 30, 35, 653 P.2d 284 (1982), *overruled on other grounds by Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).[7] Custodial interrogation for purposes of *Miranda* and its progeny "'refers not only to express questioning, but also to any words or actions on the part of the police . . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Sargent*, 111 Wn.2d 641, 650, 762 P.2d 1127 (1988) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)) (alteration in original).

Police may freely question a suspect who knowingly, voluntarily, and intelligently waives his or her rights to counsel and silence. *Davis*, 512 U.S. at 458; *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986) (quoting *Miranda*, 384 U.S. at 444). However, a suspect who has waived his or her rights may reassert them at any time. *State v. Radcliffe*, 164 Wn.2d 900, 906, 194 P.3d 250 (2008).

To invoke his or her right to counsel, the suspect must do so unequivocally as "'[a] statement either is . . . an assertion [of the right to counsel] or it is not.'" *Smith v. Illinois*, 469 U.S. 91, 97-98, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984) (quoting *People v. Smith*, 102 Ill.2d 365, 375, 466 N.E.2d 236 (1984) (Simon, J. dissenting)) (second alteration in original). We look to the specific wording of the defendant's request for counsel and the "circumstances leading up to

---

[7] Article I, section 9 of the Washington State Constitution mirrors the Fifth Amendment, stating that "[n]o person shall be compelled in any criminal case to give evidence against himself." Both constitutions offer equivalent protections in the context of custodial interrogations. *State v. Earls*, 116 Wn.2d 364, 374-75, 805 P.2d 211 (1991).

the request" to determine whether the defendant has unequivocally invoked his or her right to counsel. *Smith*, 469 U.S. at 498. Where "a reasonable police officer in light of the circumstances would" understand the statement to be a request for an attorney, the request is unequivocal. *Davis*, 512 U.S. at 459.

> Once a suspect has
>
> expressed his desire to deal with the police only through counsel . . . [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards*, 451 U.S. at 484-85; *Robtoy*, 98 Wn.2d at 37. A suspect initiates contact with police by "evinc[ing] a willingness and a desire for a generalized discussion about the investigation" unrelated to "the incidents of the custodial relationship." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983) (lead opinion of Rehnquist, J.); *Bradshaw*, 462 U.S. at 1055 (dissent of Marshall, J.).

Any statement obtained through custodial interrogation without a proper waiver of the rights to silence and counsel is inadmissible. *Miranda*, 384 U.S. at 479. If the trial court admits a statement obtained in violation of *Miranda*, we must reverse any resulting conviction unless convinced that the error was harmless beyond a reasonable doubt. *State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996). The State bears the burden of showing that a *Miranda* violation is harmless. *Easter*, 130 Wn.2d at 242.

Womack initially contends that the trial court erred in admitting his statements because it failed to enter findings of fact and conclusions of law about their admissibility. CrR 3.5, which governs the admissibility of an accused's statements, requires the trial court to hold a pretrial hearing on the admissibility of any such statements and make written findings setting forth "(1)

the undisputed facts; (2) the disputed facts; (3) conclusions as to the disputed facts; and (4) conclusion[s] as to whether the statement is admissible and the reasons therefor." CrR 3.5(a), (c). Although a trial court's failure to enter the necessary findings and conclusions "is error, it is harmless as long as oral findings are sufficient to allow appellate review." *State v. Thompson,* 73 Wn. App. 122, 130, 867 P.2d 691 (1994). Here, the trial court made "detailed oral findings" of fact and conclusions of law after the CrR 3.5 hearing, and we find them sufficient to allow review. *Thompson,* 73 Wn. App. at 130. We review these oral findings and conclusions by determining whether substantial evidence in the record supports the findings and then determining whether those findings support the trial court's conclusions of law. *State v. Grogan,* 147 Wn. App. 511, 516, 195 P.3d 1017 (2008).

Womack does not challenge the trial court's oral findings that (1) he received the *Miranda* warnings at the opening of his first interview with Voelker; (2) he stated he understood his rights but would speak with Voelker; (3) he made statements to Voelker after waiving his rights;[8] (4) he ended the first interview by telling Voelker, "[t]alk to my attorney[,] I'm done;" (5) Voelker ended the first interview after Womack requested counsel; (6) Voelker returned the next day, re-read him his *Miranda* rights, and questioned Womack further after Womack expressed a willingness to talk to him; (7) Voelker transported Womack to the local airport after ending the second interview; (8) he made statements to the police during the ride to the airport and at the airport without them asking him any questions;[9] (9) he made further unprompted

---

[8] Specifically, Womack stated that he knew what the charges were, that AW was ungrateful, and that everyone was lying about him when they told Voelker he had abused AW.

[9] At the airport, Womack stated that his family was "dead to [him]." VRP (Nov. 14, 2011) at 183.

14

statements upon arriving at the Cowlitz County Jail;[10] and (10) Womack responded to Voelker's statement that he was leaving and asking if Womack had anything to tell him by stating he knew information that would make the local judges look bad, that his parents had manipulated AW into lying about him, and that he did not think he could forgive AW. VRP (Nov. 14, 2011) at 175. These findings are, therefore, verities on appeal. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). In any event, substantial evidence in the form of Voelker's uncontroverted testimony supports these findings.

Given its findings, we hold that the trial court properly concluded that the statements made during Voelker's first interview with Womack were admissible. Womack validly waived his rights to silence and counsel. This waiver made any statements produced through custodial interrogation before his later invocation of his right to counsel admissible. *Davis*, 512 U.S. at 458.

We also hold that the trial court properly treated Womack's statement, "[t]alk to my attorney[,] I'm done," which ended the first interview, as an unequivocal invocation of Womack's right to counsel. Through this statement, Womack expressed an unequivocal desire to deal with police through his counsel. *Compare Smith*, 469 U.S. at 97-98 (suspect invoked his right to counsel by stating that he'd "like to" avail himself of his right to consult with counsel or have counsel present during interrogation) *with Davis*, 512 U.S. at 462 ("[m]aybe I should talk to a lawyer" is an equivocal invocation of the right to counsel). A reasonable police officer in the circumstances would understand Womack had invoked his right to counsel, and nothing Womack stated earlier in the interview would make his words equivocal.

---

[10] At the jail, Womack stated that any prosecution of him would cast the county in an extremely bad light.

We further hold that the trial court erred by concluding that any statements made by Womack during his second interview at the Gundy County Jail were admissible. Womack's invocation of his right to counsel the prior day prohibited police from doing exactly what they did: interrogating him further without his initiating contact with them or the provision of counsel to him. *Edwards*, 451 U.S. at 484-85. The trial court concluded that Voelker's re-reading the *Miranda* warnings had rendered Womack's subsequent statements voluntary, but this was incorrect as a matter of law because Womack never "reestablishe[d] a line of communication with the police." *Robtoy*, 98 Wn.2d at 37 (citing *Edwards*, 451 U.S. at 484-85).

We also hold that the trial court erred as a matter of law when it concluded that the statements Womack had made during the car ride to the airport and at the airport were admissible. By returning Womack to the interrogation room on the second day and asking him about AW's allegations, Voelker violated Womack's right to counsel under *Edwards*, 451 U.S. at 484-85. Where a defendant makes custodial statements in close temporal proximity to a violation of *Edwards*'s commandment that they cease interrogation until the suspect has counsel or reinitiates contact, the statements are made involuntarily as a matter of law. *United States v. Thomas*, 521 F. App'x. 878, 882-83 (11th Cir. 2013) (statement obtained 20 minutes after *Edwards* violation involuntary as a matter of law); *United States v. Gomez*, 927 F.2d 1530, 1538-39 (11th Cir. 1991) (statement obtained less than a few minutes after *Edwards* violation involuntary as a matter of law). The record does not disclose the length of time elapsing between Voelker's second interview with Womack and the statement made at the airport. The State therefore cannot surmount its burden of showing that Womack voluntarily made the statement that his family was dead to him.

16

Despite Voelker's failure to honor Womack's invocation of his right to counsel, we hold that the trial court properly concluded that Womack's unprompted statement at the Cowlitz County Jail about how his prosecution would make the county look bad was admissible. As noted, custodial statements made in close temporal proximity to an *Edwards* violation are involuntary as a matter of law. However, the coercion inherent in police-initiated custodial interrogation dissipates after interrogation ceases. *Hill v. Brigano*, 199 F.3d 833, 842-43 (6th Cir. 1999). Statements obtained after the passage of hours may sufficiently eliminate the coercion inherent in custodial interrogation and allow the suspect to initiate contact with police, waive his or her rights, and voluntarily make statements. *Hill*, 199 F.3d at 842-43; *see Gomez*, 927 F.2d at 1539 n.8.

Here, although Womack had spent the day in transit with police, he had been in public, both in an airport and on an airplane for much of that time, and Voelker and the other officer had asked Womack no questions. The break in custodial interrogation was sufficient to allow Womack to voluntarily initiate contact with police. *See Hill*, 199 F.3d at 842-43. By offering unprompted statements about how any prosecution of him would make the county look bad, Womack expressed a generalized "willingness and desire" to speak about the investigation, reinitiating contact with police. Womack had previously stated that he understood his rights; his decision to make unprompted statements was therefore knowing, voluntary, and intelligent. *See Hill*, 199 F.3d at 843 (previous waivers can show understanding of the nature and import of rights, making subsequent statements knowing, voluntary, and intelligent). The statement was admissible.

We finally hold that the trial court properly admitted the statements Womack made after Voelker had asked Womack at the Cowlitz County Jail if he had anything to say to him. As the

17

trial court properly determined, that statement constituted custodial interrogation. *Sargent*, 111 Wn.2d at 650 (quoting *Innis*, 446 U.S. at 421). Nevertheless, by reinitiating contact with Voelker at the jail, Womack allowed Voelker to permissibly engage in such custodial interrogation. *Edwards*, 451 U.S. at 484-85.

We now turn to whether the admission of the erroneously elicited statements was harmless beyond a reasonable doubt. Womack contends the error in admitting the statements could never be harmless because the lack of physical evidence meant that the jury's verdict turned on its credibility determinations. While we agree that the court erred in concluding that statements Womack made during the second interview at the Gundy County Jail, the car ride to the airport, and while at the Illinois airport were admissible, Voelker did not relate any statements made during the second interview or the car ride to the jury. VRP (Nov. 22, 2011) at 817-22. Statements the jury never heard could not affect its verdict and any error was harmless. While Voelker did testify that Womack stated at the airport that his family was dead to him, any error admitting statements obtained in violation of *Miranda* may be harmless if the statements are cumulative with properly obtained statements. *State v. Nysta*, 168 Wn. App. 30, 43, 275 P.3d 1162 (2012), *review denied*, 177 Wn.2d 1008 (2013). Voelker testified to untainted statements that Womack made about his grievances with his family: that AW was ungrateful for the money he spent getting custody, that AW and every other member of his family was lying about him, that his parents had contrived the whole affair, and that he could never forgive AW. Thus, even if the verdict turned on credibility determinations, the unprompted statement that his family was dead to him was cumulative of these properly admitted statements about Womack's ill feelings toward his family and was harmless beyond a reasonable doubt.

We further find the error in admitting Womack's statement that his family was dead to him harmless beyond a reasonable doubt because overwhelming untainted evidence supports his convictions for child rape and child molestation. AW testified about Womack's abuse, stating that it occurred frequently beginning when she was 8 and ending when she was 13. AW also described the night that Womack and Ashley both abused her. Ashley testified to Womack's statement after she confronted him about the abuse, that the abuse would stop, a statement amounting to an admission that the abuse had occurred. Ashley also testified in detail about the night Womack ordered her to help him abuse AW. KV's mother testified that AW told her of the abuse. KV and AW both testified about the incident where KV saw Womack tickling AW and yelled at him to get off of her. KV testified that Womack was angry about KV's demand, and AW testified this anger arose from Womack's fear that the demand showed that KV knew he was abusing AW. This body of evidence overwhelmingly pointed to Womack's guilt.

Overwhelming untainted evidence also supports the witness tampering conviction. AW testified about Womack's statements that he had the sex toy Ashley had used to abuse AW and would use it to keep Ashley silent. Ashley testified about receiving Womack's letter from jail which referenced the "incriminating" evidence he had and told her to change her story at trial or face disclosure of this evidence. Ex. 59. The trial court admitted the letter, and Womack admitted writing it. This body of evidence pointed overwhelmingly to Womack's guilt. The errors in admitting Womack's statements were harmless beyond a reasonable doubt.

### III. RIGHT TO COUNSEL

Womack next contends that the trial court denied his right to counsel by improperly allowing him to represent himself. Specifically, Womack contends that the trial court erred

19

because his request to represent himself was equivocal, basing this argument on statements he made during the trial court's colloquy with him. We disagree.

Criminal defendants have the right, under both the state and federal constitutions, to represent themselves if they waive their right to counsel. *City of Bellevue v. Acrey*, 103 Wn.2d 203, 209, 691 P.2d 957 (1984) (citing WASH. CONST. art. I, § 22; U.S. CONST. amend. VI; *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed 2d 562 (1975)). A defendant may waive the right to counsel only by providing a "knowing, voluntary, and intelligent" waiver. *Acrey*, 103 Wn.2d at 208-09. The defendant must express this waiver unequivocally. *State v. DeWeese*, 117 Wn.2d 369, 376-77, 816 P.2d 1 (1991) (quoting *State v. Imus*, 37 Wn. App. 170, 179-80, 679 P.2d 376 (1984)).

Womack argues that, regardless of whether his waiver was knowing, voluntary, and intelligent, he made it equivocally because some of his answers during the colloquy suggested all he wanted was a different appointed attorney. While Womack did ask whether he could have a different attorney appointed to represent him during the colloquy, which might suggest an equivocal desire to represent himself, by the end of the colloquy Womack had disavowed any equivocation about proceeding pro se. When the trial court ultimately asked him about appointing another attorney, Womack responded, "Yeah, I did say that. And the more and more I think about it the more it's just–I think I'm doing the right thing [proceeding pro se]." VRP (Aug. 18, 2011) at 42. The trial court then explicitly asked Womack to explain "why [he] wouldn't want to have a licensed attorney help" him with trial, given the consequences of a

guilty verdict. VRP (Aug. 18, 2011) at 45. Womack responded, "I guess my best answer was the only person I really trust at this point is myself."[11] VRP (Aug. 18, 2011) at 45.

Given his answers to the trial court during the colloquy, Womack offered an unequivocal, knowing, voluntary, and intelligent waiver of his right to counsel so that he could represent himself. We hold that the trial court properly allowed Womack to proceed pro se.

IV. STATEMENT OF ADDITIONAL GROUNDS (SAG) CONTENTIONS

In addition to the three arguments raised in his appellate brief, Womack raises an additional 38 issues in his SAG, many of which involve multiple claims. We find no merit in any of these additional grounds.

A.      Additional Ground 1 (No Probable Cause for Arrest)

Womack first asserts that the trial court erred by finding probable cause to arrest him based on the information provided in the affidavit of probable cause and that his defense counsel rendered ineffective assistance for failing to challenge the State's showing of probable cause. The State's warrant application and its supporting affidavits are not in the record designated for appeal, and we cannot review Womack's claims. *See State v. Bennett*, 168 Wn. App. 197, 206-07 & n.9, 275 P.3d 1224 (2012) (defendant bears the burden of perfecting the record and the failure to designate necessary materials precludes our review).

B.      Additional Ground 2, 8, and 10 (Time for Trial Violation)

Womack claims several other violations of the time for trial rule in his SAG. Womack's first additional CrR 3.3 claim concerns the State's failure to employ the Interstate Agreement on

---

[11] During the colloquy Womack also expressed a belief that he would do the best job in representing himself and that "[he] would be able to get to the jury a lot better . . . than [an] attorney." VRP (Aug. 18, 2011) at 40, 42.

Detainers to secure his presence for a speedy trial. Womack argues this constituted a violation of his constitutional right to a speedy trial, although he cites cases dealing with CrR 3.3.

CrR 3.3(d)(3) requires a party who objects to a trial date as untimely to move, in writing, for a trial set within the time required by CrR 3.3 and to note the matter for a hearing. To the extent that Womack raises a claim under CrR 3.3, his failure to object to an untimely setting of his trial waives his challenge. To the extent that Womack's challenge is constitutional, we address it below with the remainder of his speedy trial claims.

Womack also claims that the trial court violated CrR 3.3 in denying written motions made on September 21, October 6, and October 27, 2011. In addition to complying with the requirements of CrR 3.3, any motion made to set a different trial date or to dismiss based on CrR 3.3 must "'alert the trial court to the type of error involved.'" *State v. Chavez-Romero*, 170 Wn. App. 568, 581, 285 P.3d 195 (2012) (quoting *State v. Frankenfield*, 112 Wn. App. 472, 475-76, 49 P.3d 921 (2002)), *review denied*, 176 Wn.2d 1023 (2013). The September 21 motion concerned the August 18 trial setting. This motion, however, was not made within 10 days after the August 18 setting, as required by CrR 3.3(d)(3). Therefore, Womack waived his objection to the August 18 trial setting. The October 6 motion appears to object to the trial date set on August 25 and was also untimely, waiving any objection. Even if the motion were timely, it did not alert the trial court to the error involved or what it needed to do to correct the error and waived any time for trial claim. *Frankenfield*, 112 Wn. App. at 475-77. The October 27 motion concerned the October 20 trial setting. The motion did not reference CrR 3.3 or specify the nature of the trial court's error or the action necessary to remedy it. Again, Womack waived his time for trial claim. *Frankenfield*, 112 Wn. App. at 475-77.

C.      Additional Grounds 3 and 12 (Access Issues)

Womack claims that the State deprived him of access to legal materials and the ability to contact witnesses to prepare for his defense.[12] We decline to grant him relief for three reasons. First, Womack concedes that he had access to the necessary legal materials after the trial court mediated between him and prison officials. Second, Womack's complaints appear to result from rules and procedures related to legitimate penological needs, and his right to access legal materials and speak with witnesses is bounded by those needs. *Lewis v. Casey*, 518 U.S. 343, 361-62, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996). Third, the trial court appointed Womack standby counsel and an investigator; and these appointments ensured his constitutional right to court access as well as any needed legal research or contact with witnesses. *State v. Bebb*, 108 Wn.2d 515, 524-25, 740 P.2d 829 (1987).

D.      Additional Ground 4 (*Brady* Violation)

Womack next maintains that the State failed to provide him with discovery in violation of the duty recognized in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

To succeed on a *Brady* claim, a defendant must show that (1) the State "willfully or inadvertently" failed to disclose evidence (2) "favorable to the accused" and that (3) this evidence was "material," meaning that the State's failure to disclose it undermines confidence in the verdict resulting from the trial. *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 486-87, 276 P.3d 286, *cert. denied by Washington v. Stenson*, 133 S. Ct. 444 (2012).

---

[12] Womack also claims that he was required to appear before the jury without shaving on two occasions and he also appeared in poor health due to weight loss from poor confinement conditions. No evidence in the record supports these claims, and we cannot address them in Womack's direct appeal. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

Womack's *Brady* claims falter on one or more of these elements. He does not show the existence of some of the evidence he claims the State failed to disclose, and he admits that the State gave him the rest of the evidence he cites as involved in his *Brady* claim. Evidence that never existed or which the State has provided cannot form the basis of a *Brady* claim. *See Stenson*, 174 Wn.2d at 486-87. Further, Womack fails to show that the evidence underlying his *Brady* claims was favorable to his defense. Finally, he does not show any missing evidence was material under *Brady*. Womack could, and did, argue that the witnesses against him lacked credibility. Womack offers no support for his argument that undisclosed evidence would have made his attacks any more effective.

E.    Additional Grounds 5, 7, 8, 9, 10, and 11 (Speedy Trial Violation)

Womack also asserts violations of his constitutional right to a speedy trial. We review these claims de novo. *Ollivier*, 178 Wn.2d at 826.[13,14]

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee criminal defendants the right to a speedy trial.[15] The two constitutional provisions provide coextensive protection, and we apply the federal test to

---

[13] Womack's fifth additional ground alleges ineffective assistance of counsel because his counsel requested a continuance to prepare for trial. Prevailing on an ineffective assistance of counsel claim requires showing that defense counsel's choice was not legitimate trial strategy. *State v. Bobenhouse*, 143 Wn. App. 315, 328, 177 P.3d 209 (2008). Because defense counsel's decision to seek a continuance to prepare to adequately represent his or her client is "sound trial strategy," Womack cannot prevail on this claim. *Bobenhouse*, 143 Wn. App. at 329.

[14] Many of these additional grounds also assert that the State erred by failing to provide timely discovery. Womack sought no remedy in the trial court and waived any claim of error in this regard. *State v. Strine*, 176 Wn.2d 742, 749-50, 293 P.3d 1177 (2013).

[15] The due process clause of the Fourteenth Amendment to the United States Constitution "impose[s]" the federal right to a speedy trial on state criminal prosecutions. *Barker v. Wingo*, 407 U.S. 514, 515, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

24

determine if the State has violated a defendant's right to a speedy trial. *Ollivier*, 178 Wn.2d at 827.

Because "pretrial delay is often 'inevitable and wholly justifiable,'" we employ a balancing test that "is necessarily dependent on the specific circumstances of each case" to determine if a speedy trial violation occurred. *State v. Iniguez*, 167 Wn.2d 273, 282-83, 217 P.3d 768 (2009) (quoting *Doggett v. United States*, 505 U.S. 647, 656, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)). The defendant must first show the pretrial delay was so lengthy that prejudice must be presumed. *Ollivier*, 178 Wn.2d at 826. If the defendant makes this showing, we look to the "'[l]ength of delay'" between accusation and trial, "'the reason for the delay,'" whether the defendant has asserted his or her right to a speedy trial, and any "'prejudice to the defendant'" to weigh the State's and the defendant's relative culpability in the delay. *Ollivier*, 178 Wn.2d at 827 (quoting *Barker v. Wingo*, 407 U.S. 514, 515, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)). Where the balance tips toward greater State culpability, a speedy trial violation has occurred and we must dismiss the charges against the defendant with prejudice. *Iniguez*, 167 Wn.2d at 282-83.

1. Threshold Showing

Womack bears the burden of first demonstrating that the pretrial delay between formal accusation by the State and trial extended long enough to trigger the full four-factor constitutional balancing test. *Iniguez*, 167 Wn.2d at 283. Based on the charges and the parties' reliance on live testimony, we agree with Womack that the 13-month interval between the accusation and his trial triggers the full constitutional analysis, which we now turn to. *See Iniguez*, 167 Wn.2d at 292.

## 2. Length of the Delay

We first examine the length of the delay between when the State accused Womack and when it tried him. We consider "'the extent to which the delay stretches beyond the bare minimum needed to trigger' the [four factor] inquiry." *Iniguez*, 167 Wn.2d at 293 (quoting *Doggett*, 505 U.S. at 652). The 13-month lapse between the accusation against Womack and the start of his trial does not stretch much beyond the bare minimum necessary to trigger the full inquiry and this factor weighs in favor of the State. *Ollivier*, 178 Wn.2d at 828-30 & n.6 (collecting cases and noting that courts typically do not find constitutional violations where the pretrial delay lasted less than two years).

## 3. Reasons for the Delay

We next look to the reasons for the delay. We evaluate "each party's responsibility for the delay, and different weights are assigned to delay, primarily related to blameworthiness and the impact of the delay on [the] defendant's right to a fair trial." *Ollivier*, 178 Wn.2d at 831. A defendant's waiver of a speedy trial date weighs against him or her in this analysis. *Ollivier*, 178 Wn.2d at 831. Further, we impute the defendant's attorney's actions to the defendant when done in the course and scope of the representation, so we weigh any request for a continuance by the defense attorney against the defendant, even where the defendant objects. *Ollivier*, 178 Wn.2d at 832-35 (citing *Vermont v. Brillon*, 556 U.S. 81, 89-91, 129 S. Ct. 1283, 173 L. Ed. 2d 231 (2009)). In contrast, State actions intended to frustrate the defendant's right to a speedy trial weigh heavily against it in this factor. *Ollivier*, 178 Wn.2d at 832. Other reasons for delay that weigh against the State, although less heavily, include court congestion or the inability to produce a witness on the scheduled date. *Barker*, 407 U.S. at 531; *Ollivier*, 178 Wn.2d at 832.

The second factor also weighs against Womack. Womack or his attorney requested or caused most of the delays in Womack's trial through waiver of his initial speedy trial date, requesting continuances, or requesting action by the trial court that resulted in delay, such as filing late motions or unexpectedly moving to proceed pro se. The State sought one continuance to secure the presence of witnesses, and the trial court ordered one continuance because another criminal trial had higher priority than Womack's. Under the criteria above, we weigh these continuances lightly against the State, and we conclude that Womack or his attorney bore responsibility for most of the delay.

4. Womack's Assertion of His Right to a Speedy Trial

We also look to the defendant's assertion of his or her right to a speedy trial. After the signed speedy trial waiver lapsed, Womack objected to each continuance and asserted his right to a speedy trial. This factor weighs in Womack's favor.

5. Prejudice

Finally, we examine the prejudice that any delay in trial causes a defendant. We look to three types of prejudice: "'oppressive pretrial incarceration,'" "'anxiety and concern'" caused by the criminal accusation, and the possible loss of exculpatory evidence due to the passage of time. *Ollivier*, 178 Wn.2d at 840 (quoting *Doggett*, 505 U.S. at 654).

The first type of prejudice arises from pretrial detention. Womack's 11-month detention falls short of the length of incarceration necessary for a finding of oppressive pretrial detention. *Ollivier*, 178 Wn.2d at 844 (collecting cases). Womack argues that he experienced oppressive pretrial detention because his incarceration affected his health, causing him to lose weight and appear unhealthy. No evidence in the record substantiates his claims in this regard, and we cannot review them. *McFarland*, 127 Wn.2d at 335.

27

The second type of prejudice arises from the fact that the State has accused the defendant of a crime. As any accusation subjects a criminal defendant to anxiety and concern, the accused must demonstrate some type of special or undue anxiety resulting from the accusation. *Ollivier*, 178 Wn.2d at 845 (collecting cases). Womack makes no argument that he suffered some undue anxiety or concern that sets him apart from other defendants, and we find no prejudice of this type. *See Ollivier*, 178 Wn.2d at 845 (no undue anxiety resulting from accusation of sex crime).

Finally we look to whether the delay impaired the defendant's defense. While Womack generally claims that witnesses sometimes had difficulty remembering events, his witnesses testified consistently with his expectations. *Ollivier*, 178 Wn.2d at 845. Womack also fails to allege or show that the State's witnesses forgot exculpatory evidence and thus fails to show particularized prejudice in that regard. Womack's claim that trial delays allowed AW and Ashley to prepare their testimony is also unavailing. Womack pointed out the numerous inconsistencies between the stories of AW and Ashley at trial. We cannot now conclude that these witnesses had so synchronized their stories as to prejudice Womack because of the delay in trying him.

6. Balancing the Speedy Trial Factors

Womack received a trial within a year of his arrest, and just over a year after the State accused him of criminal activity. The delays resulted largely from Womack's explicit waiver of his right to a speedy trial, continuances granted to allow him or his attorney to prepare for trial, or the necessity of allowing the State to act to respond to Womack's motions. While Womack asserted his right to a speedy trial, his counsel frequently undercut this assertion with requests for continuances. In addition, Womack does not show that any delay caused him particular prejudice. The Supreme Court recently found no constitutional speedy trial violation in *Ollivier*,

a case involving similar charges and greater delays occurring for similar reasons. 178 Wn.2d at 846. We find no speedy trial violation here based on that case.

F.    Additional Grounds 6, 21, and 36 (Prosecutorial Misconduct)

Womack next contends that the prosecutor committed dozens of instances of misconduct related to his request for bail and during opening statements, rebuttal, and closing arguments.[16]

The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution secure to criminal defendants the right to a fair trial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). A prosecutor's improper conduct can deprive a criminal defendant of this right. *Glasmann*, 175 Wn.2d at 703-04. To show misconduct, a defendant must show both that the prosecutor acted improperly and that this impropriety prejudiced him or her, meaning that the impropriety had "a substantial likelihood of affecting the jury's verdict." *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). A defendant who fails to object to alleged misconduct waives any claim of error unless he or she can show the act was so "flagrant and ill intentioned" that no curative instruction could obviate the resulting prejudice. *Emery*, 174 Wn.2d at 760-61.

Womack is not entitled to relief based on the State's arguments at the bail hearing. The prosecutor did misstate the State's evidence against Womack, and arguably may have misstated Womack's awareness of an investigation before his arrest, implying that Womack had fled prosecution. Assuming that the State made improper argument, there is no likelihood any impropriety affected the verdict. No evidence indicates that anyone outside the courtroom at the

---

[16] Womack also alleges that his counsel provided ineffective assistance by telling him the prosecutor had done nothing wrong in her opening statement, suggesting that he failed to object because of this advice. No evidence in the record substantiates this allegation, and we cannot review it. *McFarland*, 127 Wn.2d at 335.

time of the bail hearing ever heard the State's misstatements, and Womack had the use of voir dire and the juror challenges to strike any biased jurors. Further, while Womack contends the argument about his risk of flight affected his bail and prejudiced his ability to prepare for trial, the trial court later stated that it set bail based on the possible punishment resulting from a conviction, meaning that any improper argument by the State had no effect on Womack's bail or Womack's ability to prepare for trial.

Turning to Womack's claims about the State's opening statement, rebuttal, and closing arguments, we note that Womack failed to object to all but two of the arguments he claims constituted misconduct. Even if we assumed that each statement to which Womack now objects was improper, his failure to object indicates that none of these arguments appeared prejudicial when made. *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990). More importantly, he has not met his burden of showing that no curative instruction would have obviated any prejudice. He has not preserved his challenges to the remarks to which he did not object.

As to the two instances where Womack objected, the trial court offered a curative instruction, and we presume the jury followed these instructions, curing any error. *Swan*, 114 Wn.2d at 661-62.

G.    Additional Ground 14 (State's Witness Tampering)

Womack further claims that the State engaged in witness tampering and denied his right to compulsory process guaranteed by the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution. Specifically, Womack contends that Voelker impermissibly contacted his brother after Womack endorsed him as a witness, leading his brother to refuse to communicate with him.

Womack provides no evidence that Voelker tampered with a witness or acted improperly. Nothing suggests that Voelker asked Womack's brother to testify falsely, withhold information, or absent himself from a proceeding. RCW 9A.72.120. Further, the contact Womack objects to apparently concerned the investigation into Ashley's abuse of AW and had nothing to do with his trial. We find no authority prohibiting law enforcement from investigating alleged crimes in this manner.

Further, Womack could have compelled his brother's appearance, but chose not to. Therefore, we also find no merit in his compulsory process challenge.

H.    Additional Ground 15 (Exclusion of Evidence)

Womack maintains that the trial court erred in excluding mention of explicit photos of AW found on her phone. Womack sought to use the photos' existence to undermine AW's credibility, a tactic forbidden by RCW 9A.44.020 (2). The trial court did not err.

I.    Additional Ground 16 (Discovery Violation)

Womack also asserts that the trial court erred in not excluding two witnesses, Cindy Clem and Ken Hall, because the State did not disclose its intent to call them until after the discovery deadline. These witnesses came forward after the discovery deadline when Womack contacted them, and the prosecutor apparently alerted Womack the day after she spoke with them. We review a trial court's refusal to impose sanctions for a discovery violation for an abuse of discretion. *See Magana v. Hyundai Motor Am.*, 167 Wn.2d 570, 582-83, 220 P.3d 191 (2009). Here, even assuming that the State violated the discovery deadlines, the trial court did not make an unreasonable decision in declining to exclude the witnesses, and we find no abuse of discretion in allowing them to testify after Womack had a chance to interview them. *See Jones*

*v. City of Seattle*, 179 Wn.2d 322, 343, 314 P.3d 380 (2013) (exclusion of witnesses a disfavored remedy for discovery violations).

J.     Additional Ground 17 (Motion in Limine Concerning Illegal Drug Use)

Womack further argues that the trial court erred in denying his motion in limine to exclude evidence of his illegal drug use. The trial court deferred a decision on the admissibility of the evidence after the State argued its relevance. We find no error in this decision. The trial court needed to hear testimony to determine the relevance of the evidence and to weigh its probative value against its prejudicial effect to determine if exclusion was appropriate. *Fenimore v. Donald M. Drake Constr. Co.*, 87 Wn.2d 85, 91, 549 P.2d 483 (1976).[17]

K.     Additional Ground 18 (Double Jeopardy/Public Trial Right)

Womack claims that the trial court denied his right "to be tried once" and appears to argue that the trial court improperly dismissed the first jury venire after a bailiff asked a spectator to leave during voir dire before the court considered the factors necessary to close the courtroom. We review de novo a claim of a double jeopardy violation. *State v. Knight*, 176 Wn. App. 936, 952, 309 P.3d 776 (2013), *review denied*, 179 Wn.2d 1021 (2014). We review a trial court's decisions regarding the dismissal of venire members for an abuse of discretion. *State v. Roberts*, 142 Wn.2d 471, 518-19, 14 P.3d 713 (2000).

---

[17] The State elicited testimony about Womack's use of illegal drugs at trial. Because the trial court reserved ruling on his motion in limine, Womack needed to object when the State elicited the testimony to preserve any claim of error for appeal. *Fenimore*, 87 Wn.2d at 92. Womack did not object when the State asked AW about using drugs with Womack, and when Womack did object when the State asked Ashley about his drug use, the trial court sustained the objection and gave a curative instruction. Womack failed to preserve any claim of error related to AW's testimony, and we presume that the trial court's instruction cured any error related to Ashley's testimony. *See Swan*, 114 Wn.2d at 661-62.

We find no merit in Womack's double jeopardy claim. Jeopardy does not attach until "the court administers the oath to a newly selected jury." *State v. Zwiefelhofer*, 75 Wn. App. 440, 443, 880 P.2d 58 (1994). The claimed court closure here occurred during the selection of the jury. The jurors selected for service had not taken the oath, and jeopardy had not attached. *See Zwiefelhofer*, 75 Wn. App. at 443.

We also hold that the trial court did not abuse its discretion by dismissing the first venire. Womack contends that the trial court erred in dismissing the first venire because there was no justification for doing so. However, article I, section 10 of the Washington State Constitution ensures the public's right to the open administration of justice. *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 36-39, 640 P.2d 716 (1982). That right is independent of any right to a public trial that the defendant may assert. *State v. Duckett*, 141 Wn. App. 797, 803-04, 173 P.3d 948 (2007). The public's article I, section 10 right requires that voir dire occur in open court, unless the trial court examines on the record the factors prescribed in *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995), and concludes that it may permissibly close the courtroom. *Duckett*, 141 Wn. App. at 802-05. Here, the bailiff asked a member of the public to leave during voir dire without the trial court's prior consideration of the *Bone-Club* factors, violating the public's right to the open administration of justice. The trial court dismissed the original venire and proceeded with a new panel to cure that violation and to ensure the public had the right to view the entirety of Womack's trial.

L.      Additional Ground 19 (For Cause Challenges)

Womack next argues that the trial court erred by denying several of his "for cause" challenges to venire members. We review a trial court's decision on a challenge for cause for an abuse of discretion. *State v. Davis*, 175 Wn.2d 287, 312, 290 P.3d 43 (2012), *cert. denied*, 134

S. Ct. 62 (2013). We give great deference to the trial court because of its ability "'to observe the juror's demeanor [during voir dire], and, in light of that observation, to interpret and evaluate the juror's answers to determine whether the juror would be fair and impartial.'" *Davis*, 175 Wn.2d at 312 (quoting *State v. Gentry*, 125 Wn.2d 570, 634, 888 P.2d 1105 (1995)).

Both the federal and state constitution guarantee criminal defendants "the right to trial by an impartial jury." *Davis*, 175 Wn.2d at 312; *see also* U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22. A defendant may exercise this right by moving to excuse any prospective juror for cause where they show actual bias. RCW 4.44.130, .190.[18] The trial court does not abuse its discretion by refusing to excuse a juror who has demonstrated bias if the trial court can satisfy itself that the juror can "disregard [the bias] and try the issue impartially." RCW 4.44.190; *State v. Noltie*, 116 Wn.2d 831, 838-40, 809 P.2d 190 (1991).

Womack questions the denials of his challenges for cause of potential jurors 3, 11, 32, 36, and 58. Each of them stated that they would try to be fair and impartial. The trial court accepted these statements, and we see no abuse of discretion in its doing so. *See Davis*, 175 Wn.2d at 312 (quoting *Gentry*, 125 Wn.2d at 634).

Womack also asks that we find error in the seating of potential jurors 6, 9, 10, 22, 26, and 31. Womack failed to object to the seating of any of these jurors; indeed, he specifically told the trial court he had no objections to the jury when asked. Womack waived any claim of error by failing to seek any corrective action in the trial court. *See Strine*, 176 Wn.2d at 749-50.[19]

---

[18] A juror possesses actual bias where he or she evidences a "state of mind . . . which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging" the seating of the potential juror. RCW 4.44.170(2).

[19] Womack also alleges that the trial court erred in restricting his ability to ask potential jurors two questions during voir dire. Womack does not explain how the court abused its discretion in

34

M.      Additional Ground 22 (Jurors' Ability to Hear)

Womack further maintains that the trial court erred by denying the jury the ability to hear the testimony of witnesses because the sound system had difficulties. Womack did not seek corrective action in the trial court and waived this claim of error. *Strine*, 176 Wn.2d at 748-50.

N.      Additional Ground 23 (Admission of E-mails)

Womack claims the trial court erred by allowing the State to admit a copy of an e-mail between AW and Womack and allowing Voelker to testify that he received a copy of two e-mails during the course of his investigation.

To admit evidence, the proponent of the evidence must authenticate it. ER 901(a). To do so, the proponent must introduce "'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *State v. Bradford*, 175 Wn. App. 912, 928, 308 P.3d 736 (2013) (quoting ER 901(a)), *review denied*, 179 Wn.2d 1010 (2014). At trial, AW testified that she had e-mailed her father telling him to run because she had reported the abuse. When shown a copy of the e-mails, she testified they were the ones she had sent to Womack's address and that the replies were consistent with Womack's writing style and that no one other than Womack had ever written her from that address. AW sufficiently authenticated the e-mails, and Womack's claims went to their weight, not their admissibility. There was no abuse of discretion in admitting the e-mails. *Bradford*, 175 Wn. App. at 927. Womack's ER 901 claim about the e-

---

doing so or how this substantially prejudiced his right to an impartial jury. We therefore cannot grant him relief given the trial court's ability to set reasonable limits on "the scope and content of voir dire." *State v. Chanthabouly*, 164 Wn. App. 104, 140, 262 P.3d 144 (2011) (citing *State v. Davis*, 141 Wn.2d 798, 826, 10 P.3d 977 (2000)).

mails Voelker obtained fails because the State did not admit those e-mails, nor did Voelker discuss their contents.

Womack also alleges that the introduction of the e-mails violated Washington's privacy act, chapter 9.73 RCW. Womack did not raise this issue at the trial court and therefore, has waived it. *Strine*, 176 Wn.2d at 749-50.

O.      Additional Ground 24 (Demonstrative Evidence)

Womack further argues that the trial court erred in restricting his use of demonstrative evidence. Specifically, he objects to the trial court's decision to prevent him from writing out witness statements on an easel to illustrate his contention that many witness statements were inconsistent. We find no abuse of the trial court's "broad discretion to make a variety of trial management decisions, ranging from 'the mode and order of interrogating witnesses and presenting evidence,' to the admissibility of evidence, to provisions for the order and security of the courtroom." *State v. Dye*, 178 Wn.2d 541, 547-48, 309 P.3d 1192 (2013) (quoting ER 611(a)) (footnotes omitted). Womack's writing implicated the mode of interrogating witnesses and presenting evidence and, theoretically, provisions for order in the courtroom. Womack had not prepared the writing beforehand, meaning he would require time during cross-examination to make his notes. Further, the trial court could not know that Womack would faithfully transcribe witness testimony.

P.      Additional Grounds 25, 26, 27, 29, 30 (Hearsay Statements)

Womack also argues that the State impermissibly introduced hearsay testimony on numerous occasions.

ER 801(c) defines "hearsay" as an out-of-court statement "offered . . . to prove the truth of the matter asserted." ER 802 forbids the admission of hearsay evidence unless it falls within a

recognized hearsay exception. We review de novo whether a statement was hearsay, and a trial court's admission of testimony for an abuse of discretion. *State v. Edwards*, 131 Wn. App. 611, 614, 128 P.3d 631 (2006); *State v. Bourgeois*, 133 Wn.2d 389, 399, 945 P.2d 1120 (1997).

Womack first claims that the trial court erred in overruling his objection to Ashley's testimony that Womack told her that she could not take AW with her when she moved out. Womack's statement was an admission by a party-opponent and did not constitute hearsay under ER 801(d)(2). *See* 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE, § 801.34 at 388 (5th ed. 2007). The trial court did not err or abuse its discretion in admitting Ashley's testimony.

Womack also maintains that the State erred by asking KV, Ashley, and Clem to relate AW's out-of-court statements that someone abused her. In each case, Womack objected to the question and the trial court sustained his objection. The trial court had already instructed the jury that it must disregard any questions or answers to which it sustained an objection. Further, with regard to the question to Ashley, the trial court specifically admonished the jury to disregard her answer. We presume that the jury follows these instructions. *Swan*, 114 Wn.2d at 661-62. The trial court thus cured any error.

Womack next claims that the State introduced many instances of hearsay testimony to which he did not object. By failing to object or otherwise ask the trial court to take corrective action, such as speaking to the trial court outside the presence of the jury or moving for a mistrial, Womack failed to preserve his claims of error. *Strine*, 176 Wn.2d at 749-50.

Womack finally contends that the State erred by asking Voelker to relate a neighbor's statements that he had seen AW with a black eye and that AW told him Womack had given her the injury. Womack opened the door to the questions about the neighbor seeing the black eye by

asking Voelker about the matter during cross-examination. *State v. Gefeller*, 76 Wn.2d 449, 454-55, 458 P.2d 17 (1969), *overruled on other grounds by State v. Hill*, 123 Wn.2d 641, 870 P.2d 313 (1994). Therefore, the prosecutor could permissibly explore the subject on redirect. *Gefeller*, 76 Wn.2d at 454-55. Although the testimony about AW's statement to the neighbor exceeded the scope of questioning to which Womack opened the door, Womack objected to the question and the trial court sustained this objection. Because we presume the jurors followed the trial court's instructions and disregarded the statement, Womack's hearsay claim fails. *Swan*, 114 Wn.2d at 661-62.[20]

Q.    Additional Ground 28 (Misconduct in Misconstruing Evidence)

Womack next maintains that the State committed misconduct by misconstruing the evidence when questioning witnesses. He claims that the State frequently asked witnesses about the child protective services investigation in a manner suggesting it arose out of a teacher directly seeing bruises on AW's arms, rather than from the note where AW stated her father had bruised her. Womack never objected to these questions at trial and waived any claim of error. *Strine*, 176 Wn.2d at 749-50. Regardless, the child protective service's investigator specifically testified that the investigation began because of two elements: the report of bruises and the intercepted notes. The State's questions did not misstate the evidence and did not constitute misconduct.

---

[20] Womack alleges that the State's introduction of this testimony cumulatively deprived him of a fair trial. Multiple errors, even where not prejudicial standing alone, can combine to deprive a defendant of a fair trial. *State v. Garcia*, 177 Wn. App. 769, 786, 313 P.3d 422 (2013), *review denied*, 179 Wn.2d 1026 (2014). As noted, Womack failed to object to many of the instances where the State introduced hearsay testimony. Womack may not rely on unpreserved errors to make a cumulative error claim. *Garcia*, 177 Wn. App. at 786. The remainder of the alleged errors were cured by the trial court. Womack had a fair trial, and we reject his cumulative error argument.

R.    Additional Ground 31 (Limiting Video Evidence)

Womack argues that the trial court erred by restricting the amount of video evidence he could present. The trial court limited Womack's ability to show irrelevant, cumulative video: an action within its power under ER 401, ER 402, and ER 403. We find no abuse of discretion in the trial court's decision. *State v. Griffin*, 173 Wn.2d 467, 473, 268 P.3d 924 (2012).

Womack also asserts the trial court erred in sustaining the State's objections to the video evidence based on a lack of authentication. The State was well within its rights to demand that Womack authenticate any evidence he wished to introduce. ER 901(a). While Womack alleges that these objections embarrassed him, constituting misconduct, the trial court warned him that it would hold him to the rules of evidence. Womack's inability to comply with those rules does not make the State's objections misconduct.

S.    Additional Ground 32 (Discovery Issue)

Womack next maintains that the State erred by introducing evidence at trial not provided in discovery. The record designated for appeal does not contain the discovery provided or a summary thereof. We therefore cannot meaningfully review Womack's claims that the State introduced evidence that it failed to provide to him in discovery. *See Bennett*, 168 Wn. App. at 206-07 & n.9.

T.    Additional Ground 33 (Exclusion of Evidence: Child Protective Services Report)

Womack claims that the trial court erred by excluding pages of the child protective services' report that indicated that one of AW's allegations of physical abuse was unfounded. Womack never asked the child protective services investigator to authenticate the report, and the one Womack showed the investigator at trial had been altered. The court did not abuse its

discretion in denying the admission of unauthenticated, adulterated evidence. *See Bradford*, 175 Wn. App. at 927-28.

U.     Additional Ground 34 (Affair Testimony)

Womack claims that the trial court erred in allowing the State to ask AW questions about affairs he had with other women while living with Ashley. Assuming that the trial court erred by admitting the testimony, the testimony is not so prejudicial that it "affects, or presumptively affects, the outcome of the trial," and thus does not warrant reversal. *Diaz v. State*, 175 Wn.2d 457, 472, 285 P.3d 873 (2012).

V.     Additional Ground 35 (Excluding Impeachment Testimony)

Womack argues that the trial court erred by excluding testimony of the defense's investigator, whose testimony Womack wanted to use to impeach AW. To lay the foundation for impeachment, Womack needed to offer AW the chance to explain or deny the allegedly false statement. ER 613(b); *State v. Johnson*, 90 Wn. App. 54, 70-71, 950 P.2d 981 (1998). Womack failed to do so, and the trial court did not err in excluding the investigator's testimony.

W.     Additional Ground 37 (Post-trial Motions)

Womack asserts that the trial court erred by denying three of his post-trial motions. In one he sought a new trial by arguing that the prosecutor committed misconduct by "spend[ing] 20 minutes at closing [instructing the jury] how to mark the forms guilty" and that the verdict was contrary to the evidence. Clerk's Papers (CP) at 286. In another Womack sought an arrest of judgment because he claimed the State presented insufficient evidence as he had "been

charged with 5 counts of rape and the alleged victim only testified to one." CP at 287. The third moved for dismissal based on violations of the time for trial rule.[21]

We review a trial court's decision regarding a new trial under CrR 7.5 or an arrest of judgment under CrR 7.4 for an abuse of discretion. *Bourgeois*, 133 Wn.2d at 406; *State v. Wilson*, 113 Wn. App. 122, 135, 52 P.3d 545 (2002). We find none here.

Womack fails to show that the State acted improperly. The State's argument may have instructed the jury on how to fill out the verdict forms, but only because the prosecutor was summing up her case and laying out the evidence of Womack's guilt. This is the purpose of closing argument.

Womack's challenges to the sufficiency of the evidence against him also fail. We review the sufficiency of the State's evidence by looking to whether a rational trier of fact could have returned a verdict of guilty beyond a reasonable doubt after considering all the evidence in the light most favorable to the State. *State v. Miller*, 179 Wn. App. 91, 104, 316 P.3d 1143 (2014). To make his challenges, Womack must "'admit[] the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.'" *Miller*, 179 Wn. App. at 104 (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). The record contains AW's testimony that Womack abused her sexually for years, beginning when she was eight. AW testified that sometimes this abuse consisted of inappropriate touching, and sometimes it consisted of rape. The record also contains Ashley's testimony that, during one night she helped Womack abuse AW, Womack raped AW four separate times, one of these times as an accomplice to Ashley. A rational trier of fact could have found Womack guilty beyond a

---

[21] The CrR 3.3 motion does not appear to be in the record, precluding review. *Bennett*, 168 Wn. App. at 206-07 & n.9.

reasonable doubt of the charged offenses, and the State's closing argument properly distinguished the charges.

X.      Additional Ground 38 (Offender Score Calculation)

Womack finally asserts that the trial court erred in calculating his offender score. Womack contends that he could not have an offender score of more than nine as "he has never had any prior felonies." SAG at 54. The court calculated Womack's offender score consistently with the provisions of RCW 9.94A.525(17) and RCW 9.94A.589(1)(a). We find no error.

CONCLUSION

We affirm Womack's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

_____
BJORGEN, A.C.J.

We concur:

_____
WORSWICK, J.

_____
LEE, J.